Karen M. CUTLER, Executor of the
Estate of Daniel T. Cutler,
Deceased, Appellant,

v.

KLASS, WHICHER & MISHNE; Marvin J. Klass; Theodore M. Whicher; Robert D. Mishne; David C. Nyberg; Willis A. Buell; James C. Hanks; Roger L. Carter; Janet J. Brown; and James R. Villone, and each of them individually, Appellees.

No. 90–823.

Supreme Court of Iowa.

July 17, 1991.

John L. Riccolo and David L. Baker of Riccolo & Baker, Cedar Rapids, for appellant.

James L. Kramer and Thomas J. Bice of Johnson, Erb, Latham, Gibb & Carlson, P.C., Fort Dodge, for appellees.

Considered by HARRIS, P.J., and SCHULTZ, CARTER, LAVORATO, and NEUMAN, JJ.

HARRIS, Justice.

This suit against a Sioux City law firm arises from the suicide of a firm member. Shortly before the suicide the firm communicated to the distraught partner the fact that it was delaying a decision on allowing him to return to work. The claims ascribe responsibility for the suicide to the manner in which the firm communicated with decedent. By rulings on a motion to dismiss and a motion for summary judgment the trial court dismissed the claims and we affirm.

Uncommonly tragic facts are alleged. During 1985 Daniel T. Cutler, plaintiff's decedent, became deeply indebted and the value of farmland he owned depreciated drastically. Cutler was a partner of Klass, Whicher & Mishne, a Sioux City law firm.

From early in 1985 Cutler had been unable to devote attention to his practice. Other members of the firm gradually took over his professional responsibilities. By March 1 he was not competent to practice law. From March 7 to March 11 and again from March 15 to March 29 Cutler was a patient in a Sioux City hospital for treatment of severe depression.

Due to his hospitalization the firm placed Cutler on disability status, effective March 1, 1985. On March 29 the firm wrote Mrs. Cutler a letter informing her of the disability status and enclosed Cutler's check for March. The letter explained special provisions in the firm partnership agreement which apply upon incapacity of a partner. Any partner who is unable to carry on duties for a continuous period in excess of two months shall not receive any further draw until returning to work. Draws may be extended at the direction of the firm's management committee, but not in excess of another two months without the consent of the partnership. The letter also stated that it was then premature to know what Dan's future status would be with the firm but that he and all partners would receive a draw at the end of April.

While he was hospitalized Cutler retained A. Frank Baron, a Sioux City lawyer who heads his own firm, to represent him with respect to any problems regarding his tenure with the defendant firm. Baron informed the firm of this fact and requested that any communications in the matter be routed through him.

Upon his release on March 29, rather than having Baron do so, Cutler called his law partner, Marvin Klass, and stated he wished to return to the law firm to work half days in about a week. Klass asked if he could visit with Cutler's doctor. Cutler said it would not be necessary. When Klass again pressed for permission to speak with the doctor, Cutler refused. Klass then told Cutler he would have to take the matter up with the partners and would get back to him.

Following this conversation Klass called a meeting of the firm partners. The meeting was held on Sunday, March 31. The partners decided they would not act upon Cutler's request to return to work until they had spoken with his doctor or obtained other information. Obviously the partners were concerned, not only about Cutler's health, but also the clients whose affairs Cutler would attend. The minutes of that meeting indicate eight partners decided Cutler would not be allowed to return to the office until there was a full partnership meeting to consider the matter.

The following day, April 1, Klass sent a letter to Cutler and attached the minutes of the partnership meeting. The letter stated:

April 1, 1985

Dear Dan:

I am leaving for Seattle today and will not return until around April 10.

Jim Hanks and Will Buell are on trips and I would want them to be present when the partnership makes any major decisions.

Yesterday a partnership meeting was held and a unanimous decision reached concerning your return to the office. A copy of the action taken is enclosed. The consensus of the group was that a complete review and discussion should be held before a final decision is made.

Meanwhile, I am glad you are doing better and hope you continue to make good progress.

Sincerely,

Also on April 1 Klass phoned Willis Buell, another firm member who was vacationing in California, and told him of what had transpired. Buell was concerned that Cutler could misinterpret the letter as an expulsion from the firm. Buell therefore phoned Larry Noll, a close friend and business associate of Cutler, and told him about the forthcoming letter and of his concern that Cutler might misconstrue it. Noll relayed the information to Mrs. Cutler. She then telephoned the law firm and spoke with T.M. Whicher, another firm member. Although Mrs. Cutler alleges Whicher was abrupt with her, she concedes he reassured her that the letter was not notice of Dan's expulsion from the firm. Indeed Cutler was never told by anyone he would be separated from the firm.

On the night following her telephone conversation with Whicher, Mrs. Cutler told her husband he would be receiving the letter. Cutler appeared to accept it calmly. The letter from the firm was found with Cutler's body.

Cutler purchased a shotgun on Tuesday, April 2. The following day he telephoned his wife and asked her to come home for lunch but Mrs. Cutler was prevented by her work from doing so. When Cutler took his own life he left a suicide note which stated: "The farm killed me.... Talked to Tom Patterson regarding malpractice [1] case—investigation will show there is a good one.... Dump the damn farm."

Plaintiff's petition against the firm was in three counts. Although there was overlapping and mixing among the three, we take count one to assert a general negligence claim, count two asserted a claim for negligent infliction of emotional distress creating an unreasonable risk, and count three to be a claim for intentional infliction of emotional distress (outrageous conduct). The defendant firm filed a motion to dismiss which, as to the first two counts, was sustained by Judge Murray S. Underwood. The third count was dismissed by Judge Tom Hamilton on defendant's subsequent motion for summary judgment.

1. This suit originally included medical malpractice claims against Cutler's psychiatrist and the hospital in which he had been a patient. Those claims are not involved in this appeal.

■ I. Before addressing these claims in the divisions which follow, we mention the special risks and problems which attend premature attacks on litigation by motions to dismiss. Although we conclude the trial court should be affirmed, we certainly do not recommend the filing of motions to dismiss in litigation, the viability of which is in any way debatable. Neither do we endorse sustaining such motions, even where the ruling is eventually affirmed. Both the filing and the sustaining are poor ideas.

The reasons are clear enough. In the first place, in filing a motion to dismiss, a defendant gives away all the facts because in ruling on the motion well-pled facts are assumed to be true. *Berger v. General United Group,* 268 N.W.2d 630, 634 (Iowa 1978); *Sarvold v. Dodson,* 237 N.W.2d 447, 447–48 (Iowa 1976). Combined with this venerable rule is a more recent one. Under notice pleading a suit will survive a motion to dismiss whenever a valid recovery can be gleaned from the pleadings. *Lakota Consol. Indep. School v. Buffalo Center/Rake Community Schools,* 334 N.W.2d 704, 708 (Iowa 1983).

We recognize the temptation is strong for a defendant to strike a vulnerable petition at the earliest opportunity. Experience has however taught us that vast judicial resources could be saved with the exercise of more professional patience. Under the foregoing rules dismissals of many of the weakest cases must be reversed on appeal. Two appeals often result where one would have sufficed had the defense moved by way of summary judgment, or even by way of defense at trial. From a defendant's standpoint, moreover, it is far from unknown for the flimsiest of cases to gain strength when its dismissal is reversed on appeal. We emphasize that our determination of this appeal is no commendation for filing or sustaining the motion to dismiss.

■ II. The trial court took count one to be a claim for negligent infliction of emotional distress, an understandable assumption in view of the tangled pleading which sought damages in part on that basis. But, although it was largely obscured by other claims, the count also sought a wrongful death recovery on a pure negligence theory. Under the rule previously explained we must then set aside from our consideration any previously recited facts, many of which were later shown in connection with the motion for summary judgment. Our review of the dismissal of count one must weigh only the facts alleged in the petition.

The petition alleged that Cutler was a partner in defendant law firm where he had practiced eight years. He was under psychiatric care and hospitalized for a mental condition of such seriousness that he contemplated suicide. Although Cutler's psychiatrist told him he could return to work on a half-time basis, defendants refused to allow his immediate return, delaying a decision on the question until a meeting could be had of all partners. The defendant law firm sent a letter to Cutler informing him of the delay. Cutler committed suicide.

Plaintiff relies on Restatement (Second) of Torts sections 303 and 436 (1965).[2]

We have no quarrel with the principles outlined in these Restatement sections but

---

**2.** Restatement (Second) of Torts § 303 states:

An act is negligent if the actor intends it to affect, or realizes or should realize that it is likely to affect, the conduct of another, a third person, or an animal in such a manner as to create an unreasonable risk of harm to the other.

Restatement (Second) of Torts § 436 states:

(1) If the actor's conduct is negligent as violating a duty of care designed to protect another from a fright or other emotional disturbance which the actor should recognize as involving an unreasonable risk of bodily harm, the fact that the harm results solely through the internal operation of the fright or other emotional disturbance does not protect the actor from liability.

(2) If the actor's conduct is negligent as creating an unreasonable risk of causing bodily harm to another otherwise than by subjecting him to fright, shock, or other similar and immediate emotional disturbance, the fact that such harm results solely from the internal operation of the fright or other emotional disturbance does not protect the actor from liability.

are convinced they have no application here.

It is not quite unheard of for the estate of a suicide victim to raise a viable wrongful death claim. Traditionally suicide has been considered an intentional or intervening act for which the tortfeasor cannot be held responsible. *McLaughlin v. Sullivan*, 123 N.H. 335, 337, 461 A.2d 123, 124 (1983); *Falkenstein v. City of Bismarck*, 268 N.W.2d 787, 790 (N.D.1978); 74 Am.Jur.2d *Torts* § 26, at 642 (1974); W. Prosser & W. Keaton *The Law of Torts* § 44, at 311 (5th ed. 1984); Annotation, *Civil Liability for Death by Suicide*, 11 A.L.R.2d 751 (1950). These authorities also point out that occasional exceptions now exist. One, sometimes called duty to prevent, arises where, by reason of physical custody or by reason of a protective status, a person owes a duty to prevent a potential decedent from committing suicide. Examples are situations where the decedent is confined in a hospital or jail.

The same authorities establish that exceptions also can be found where a *tortious act* results in a mental condition which in turn results in an uncontrollable impulse to commit suicide or which prevents the decedent from realizing the nature of the act.

The facts alleged here qualify under no exceptions to the general rule of no liability. The firm obviously had neither care nor custody of Cutler and thus cannot be said to fall within the first-mentioned exception. Cutler's estate contends it qualifies under the second.

Plaintiff alleges the firm should have foreseen Cutler's act of suicide and for purposes here we accept the allegation. The second exception is however not sufficiently alleged because no tortious act is made out in the petition, even under the standards of notice pleading.

The firm cannot be faulted for delaying Cutler's return to active practice; indeed the firm was bound to take that position. *See* Iowa Code of Professional Responsibility for Lawyers EC 1–2; EC 1–6; EC 6–1; EC 8–7; EC 9–6; DR 1–103(C); DR 2–110(B)(3); DR 6–101(A) (1971). Even though the ethical considerations and disciplinary rules do not specifically state that members of a law firm must terminate the practice of a mentally ill partner, the firm must take steps to ensure that the public is not provided incompetent service. Several cases point out this ethical duty. *See In re Weston*, 92 Ill.2d 431, 65 Ill.Dec. 925, 929, 442 N.E.2d 236, 240 (1982) (attorney disbarred for failure to adequately supervise mentally ill associate); *In re Kiley*, 22 A.D.2d 527, 256 N.Y.S.2d 848, 849 (1965) (attorney suspended for failure to uncover ethical irregularities within law firm); *In re Fata*, 22 A.D.2d 116, 118, 254 N.Y.S.2d 289, 291 (1964) (attorney disbarred for unethical acts of fellow partner).

Plaintiff alleges Cutler was told by his doctor he could return to work on a part-time basis and wanted to do so. Because part-time work was contemplated by a seriously, mentally ill lawyer, it was obviously appropriate for the firm to inform Cutler, at least temporarily, not to do so. The petition does allege the firm knew or should have known that the manner in which Cutler was thus necessarily informed could lead to a suicide. This is only an allegation of the required standard of care; it is not an allegation that the standard was violated. The petition does not allege there was anything amiss in the message itself. We have no reason to assume the letter was any less kind and thoughtful than what we later learned it to be. Indeed the firm is blamed only for sending the message. It was however a message that, under the facts alleged, the firm was required to send. Under the facts alleged the firm had to send the message.

Because there was no tortious act alleged the dismissal of count one must be affirmed.

■ III. Count two is a claim for negligent infliction of emotional distress. The claim rests on Restatement (Second) of Torts sections 312 (emotional distress intended) and 313 (emotional distress unintended) for its allegation that the firm, acting without outrageous conduct, is liable

for emotional distress which ultimately resulted in Cutler's death.

We have rejected the principle espoused by Restatement section 313. *See Niblo v. Parr Mfg., Inc.*, 445 N.W.2d 351, 354 (Iowa 1989). We thus hold it cannot support plaintiff's count two.

Section 312 does not apply under the facts alleged. Comment b to section 312 of the Restatement states the following:

> The rule stated here extends, however, somewhat further than the rule of section 46. It permits the negligence action in any case where it may be found that the conduct, although intended to inflict emotional distress, amounts to something less than extreme outrage, but nevertheless involves an unreasonable risk, which the actor should recognize, that bodily harm will result.

With the exception of civil rights claims, our cases have never gone quite this far; we have never based liability on anything less than outrageous conduct. Under the facts alleged here we are not called upon to consider adopting the expanded theory of liability espoused in comment b to Restatement section 312. This is because the alleged conduct, for the reasons explained in division II, does not qualify either as outrageous, or as unreasonable risk. Dismissal of count two was therefore proper.

■ IV. Because plaintiff's claim of intentional infliction of emotional distress (outrageous conduct) under count three was dismissed on the firm's motion for summary judgment, we review it in the light of the more detailed facts first outlined. The elements of such a recovery are:

(1) outrageous conduct by the defendant;

(2) the defendant's intentional causing, or reckless disregard of the probability of causing emotional distress;

(3) plaintiff suffered severe or extreme emotional distress;

(4) actual and proximate cause of the emotional distress by the defendant's outrageous conduct.

*Vaughn v. Ag Processing, Inc.*, 459 N.W.2d 627, 635–36 (Iowa 1990) (citing *Vinson v. Linn–Mar Community School Dist.*, 360 N.W.2d 108, 118 (Iowa 1984)).

We have said that in emotional distress cases "it is for the court to determine in the first instance, as a matter of law, whether the conduct complained of may reasonably be regarded as outrageous." *M.H. By and Through Callahan v. State*, 385 N.W.2d 533, 540 (Iowa 1986) (citations omitted).

The gist of plaintiff's complaint is that the defendants' action in sending the letter at a time when they knew Cutler was represented by counsel and knew of Cutler's mental instability constituted reckless disregard of Cutler's susceptibility to emotional distress.

"In order for conduct to be considered outrageous it must be 'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Vaughn*, 459 N.W.2d at 636 (citations omitted).

The content of the letter cannot be said to be extremely outrageous under this standard. The letter did not indicate Cutler was removed from the partnership. Its tenor fell well within the standard. The firm members even expressed their hope and wish for a healthy recovery.

Peculiar susceptibility, by reason of physical or mental condition of the person affected, is a factor in considering whether conduct is outrageous, although "major outrage" is always the crucial element of the tort. Restatement (Second) of Torts § 46, comment f.

The letter, without any other action or conduct by defendants evidencing outrageous conduct, is not enough to generate a genuine issue of material fact on the claim of intentional infliction of emotional distress.

Neither does the remark ascribed to Whicher (which he denies making)[3] make

---

**3.** Whicher is alleged to have said to Mrs. Cutler: "Look, Karen, we've got a ___ _____ business to       run here."

out a claim under this theory. It is not claimed that the remark was ever repeated to Cutler himself. Nor does the firm's conduct in dealing directly with Cutler support the claim. The firm cannot be blamed for responding directly to Cutler (rather than through his attorney) after Cutler directly confronted the firm with a demand to return to work part-time.

Under these facts, considered singly or together, especially in view of the firm's ethical duty to protect the public from incompetent legal services, summary judgment was correctly entered.

V. We have considered and find no error in other assignments. They include the trial court's order dismissing (on summary judgment) an amended damage claim for mental anguish and wrongful death on a breach of contract and fiduciary theories. As the trial court noted, the plaintiff acknowledged receipt of all amounts due under the partnership agreement. We have already rejected plaintiff's other theories of recovery.

Because the facts do not support such a claim we do not consider whether wrongful death damages may be recovered in a breach of contract action. *See* Annotation, *Action Ex Contractu for Damages Caused by Death*, 86 A.L.R.2d 316 (1962). The majority rule appears to deny such damages. "It is often stated that damages resulting from death caused by breach of contract are not recoverable either at common law or under the wrongful death statutes." 1 S. Speiser, *Recovery for Wrongful Death*, § 2:10 (1975); 25A C.J.S. *Death* § 23, at 615 (1966).

We do find merit in plaintiff's challenge to a trial court ruling imposing sanctions against the plaintiff for failure to respond to interrogatories. *See Suckow v. Boone State Bank & Trust Co.*, 314 N.W.2d 421, 426 (Iowa 1982). The order imposing sanctions is reversed.

MODIFIED AND AFFIRMED.