Larry REEDY, Plaintiff,

v.

**WHITE CONSOLIDATED INDUSTRIES, INC., a Delaware Corporation, d/b/a/ WCI Laundry Division, Defendant.**

No. C 91–3026.

United States District Court,
N.D. Iowa,
Central Division.

July 3, 1995.

Tito Trevino, Trevino Law Office, Fort Dodge, IA, for plaintiff Larry Reedy.

Stephen D. Turner and David W. Centner of Law, Weathers & Richardson, P.C., Grand Rapids, MI, for defendant WCI.

ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, MOTION TO STRIKE EXPERTS, AND PLAINTIFF'S MOTION FOR RULING IN ADVANCE OF TRIAL

BENNETT, District Judge.

### TABLE OF CONTENTS

I. INTRODUCTION AND PROCEDURAL BACKGROUND ................ 1424
II. THE MOTION FOR SUMMARY JUDGMENT ......................... 1425
 A. Standards For Summary Judgment ................................ 1426
 B. Findings Of Fact ................................................ 1427
 1. Undisputed facts ......................................... 1427
 2. Disputed facts ........................................... 1429
 C. Legal Analysis .................................................. 1430
 1. The retaliatory discharge claim ............................. 1431
 a. Recognition of the public policy exception under Iowa law.... 1431
 b. Discharge interfering with workers compensation rights ...... 1433
 c. Reedy's retaliatory discharge claim ......................... 1434
 2. The "bad faith" claim ...................................... 1435
 a. The bad-faith cause of action under Iowa law ............... 1435
 b. Jury question or question of law? .......................... 1437
 c. Reedy's bad-faith claim .................................... 1439
 3. The intentional infliction of emotional distress claim .............. 1440
 a. Elements of the tort ....................................... 1440
 b. The outrageousness of defendant's conduct .................. 1441
 c. Sufficiency of plaintiff's emotional distress .................. 1443
 D. Conclusion...................................................... 1444
III. THE MOTION TO STRIKE EXPERTS.............................. 1445
 A. The Proffered Experts .......................................... 1445
 B. Legal Analysis .................................................. 1446
 1. Standards for expert witnesses ................................. 1446
 2. Admissibility of the proffered experts' opinions.................. 1447
 C. Conclusion...................................................... 1448
IV. THE MOTION FOR RULING IN ADVANCE OF TRIAL ............... 1448
 A. Background..................................................... 1449
 B. Legal Analysis .................................................. 1449
 1. Admissibility of administrative findings generally ................. 1449
 2. Admissibility of the Industrial Commission reports .............. 1450
 C. Conclusion...................................................... 1451
V. CONCLUSIONS ...................................................... 1451

This diversity action under Iowa law compels the court once again to navigate the increasingly explored, but still largely uncharted and sometimes treacherous waters of Iowa's common-law cause of action for first party bad faith. Here, a former employee alleges wrongful or retaliatory discharge in violation of public policy by his employer in an attempt to interfere with or retaliate for the employee's right to claim workers compensation benefits, bad faith termination of workers compensation benefits, and intentional infliction of emotional distress. The defendant employer has moved for summary judgment on all claims. The employer asserts that the plaintiff has no wrongful discharge claim, because the plaintiff was legitimately terminated for misrepresentation of his physical condition and health history; that the plaintiff has no "bad faith" claim for coverage, because workers compensation coverage in such circumstances was "fairly debatable" and because the employer sought advice of counsel before terminating cover-

age; and that there has been no outrageous conduct attributable to the employer upon which to found an intentional infliction of emotional distress claim. The employer has also moved to strike two of plaintiff's proffered experts as insufficiently qualified to give expert testimony in this matter. Plaintiff has moved for a ruling in advance of trial on the admissibility of findings in the state administrative procedures pertaining to his claim for workers compensation benefits.

## I. INTRODUCTION AND PROCEDURAL BACKGROUND

Plaintiff Larry Reedy, an Iowa resident, filed this diversity action on March 28, 1991, against his former employer, White Consolidated Industries, Inc. (WCI), a Delaware Corporation with its principal place of business in Cleveland, Ohio. Reedy worked for WCI's Laundry Division, which has a facility in Hamilton County, Iowa, but was discharged on June 21, 1990. In Reedy's original complaint, Division I, Count I, Reedy alleged wrongful and retaliatory discharge in an attempt by the employer to interfere with or retaliate for Reedy's right to claim workers compensation benefits. In Count II of that Division, Reedy sought punitive damages. In Division II of the original complaint, Count I alleged bad faith refusal to pay workers compensation benefits, and Count II sought punitive damages on the bad faith claim. WCI answered the original complaint on April 29, 1991.

On July 15, 1992, the Hon. Donald E. O'Brien, now Senior Judge of this court, certified two questions to the Iowa Supreme Court. Those questions were as follows:

1. Is an action against a self-insured employer for bad-faith failure to pay a worker's compensation claim for medical benefits recognized in Iowa?

2. If the Iowa courts were to recognize the existence of a Bad Faith Action, must the employee first litigate his workers compensation claim before the Iowa Industrial Commission and exhaust all appeals before such a Bad Faith Action is ripe for adjudication?

Upon joint motion of the parties, this matter was stayed on August 3, 1992, until the determination of the questions certified to the Iowa Supreme Court. On July 22, 1993, the Iowa Supreme Court answered both questions in the affirmative. *Reedy v. White Consol. Ind., Inc.*, 503 N.W.2d 601 (Iowa 1993). However, in light of that decision, on September 15, 1993, the court granted a further stay until an adjudication was made on the appeal of the decision of the Iowa Industrial Commissioner.

On October 31, 1994, finding that the proceedings before the Iowa Industrial Commissioner had been concluded, and finding further that the parties agreed that the stay should be lifted, Chief Magistrate Judge John A. Jarvey entered an order lifting the stay and establishing a schedule to bring this matter to trial. That order established, *inter alia*, a deadline of November 15, 1994, for motions to amend, a deadline of February 15, 1995, for the designation of expert witnesses, and a deadline of May 1, 1995, for all dispositive motions.

On December 8, 1994, Judge Jarvey granted Reedy's motion for leave to amend his complaint. The amended complaint adds, as Division III, two further counts. Count I of the new division alleges intentional infliction of emotional distress as the result of WCI's failure to provide workers compensation benefits. Count II of this new division seeks punitive damages on Reedy's claim of intentional infliction of emotional distress. WCI answered the additional counts of the amended complaint on January 20, 1995.

On April 25, 1995, Judge Jarvey granted an extension until May 22, 1995, for the filing of dispositive motions. WCI therefore timely filed a motion for summary judgment on all claims in Reedy's amended complaint on May 22, 1995. Also on May 22, 1995, WCI moved to strike two of plaintiff's experts designated on November 14, 1991. Presumably because of the stay in this matter, WCI did not depose two of these experts, Leonard Weaver and John J. Puk, until March 21, 1995. WCI requested oral arguments on both motions. Reedy resisted both the motion for summary judgment and the motion to strike experts on June 5, 1995, but joined in the requests for oral arguments on these motions. The court therefore set telephonic

oral arguments on both motions for June 30, 1995.

On June 8, 1995, Reedy moved for a ruling in advance of trial on the admissibility of findings in the administrative procedures pertaining to his claim for workers compensation benefits. The parties were requested to prepare oral arguments on this motion for June 30, 1995, as well.

At the oral arguments on June 30, 1995, plaintiff Larry Reedy was represented by counsel Tito Trevino of the Trevino Law Office in Fort Dodge, Iowa. Defendant WCI was represented at oral arguments by counsel Stephen D. Turner and David W. Centner of Law, Weathers & Richardson, P.C., in Grand Rapids, Michigan. The court found the briefs and oral arguments of the provided by counsel to be of unusually high quality and consequently most helpful in disposition of these motions. Finding these matters fully submitted, the court turns to disposition of the various motions.

## II. THE MOTION FOR SUMMARY JUDGMENT

WCI has moved for summary judgment on each of Reedy's claims. As to the retaliatory discharge claim, WCI asserts that the record is absolutely clear that Reedy was fired for misrepresenting his medical condition on his application for employment with WCI, not in an attempt to interfere with or retaliate for Reedy's right to seek workers compensation benefits. WCI points to what it calls Reedy's "admissions" in deposition that he has no evidence that he was fired in retaliation for seeking workers compensation benefits, and "admissions" that Reedy misrepresented his condition on the application forms. Reedy counters that, far from admitting that he intentionally misled WCI, his deposition generates a genuine issue of material fact as to his belief that the application form asked only about his present medical condition. Reedy also asserts that the application form and his pre-employment medical check-up with a doctor selected by WCI put WCI on notice of his history of back problems. He argues that there is a genuine issue of material fact as to whether or not WCI fired him for seeking to claim workers compensation

benefits, because WCI ignored indications of his past medical history until he actually notified WCI of an injury likely to run up medical bills and generate a workers compensation claim.

As to the "bad faith" claim, WCI argues that although the Iowa Supreme Court settled the question of whether Reedy may pursue such a claim in *Reedy v. White Consol. Ind., Inc.*, 503 N.W.2d 601 (Iowa 1993), there is no genuine issue of material fact that Reedy cannot prove the elements of such a claim. WCI asserts that the record demonstrates that it had a reasonable basis for denying Reedy's workers compensation claim, Reedy's misrepresentations of his medical history in his job application, and that coverage in this case was therefore "fairly debatable." Furthermore, WCI argues that it relied on advice of counsel in concluding that coverage was "fairly debatable" in these circumstances. Reedy argues that coverage was not "fairly debatable," and that WCI cannot assert an "advice of counsel" defense, because WCI consulted counsel with the pre-conceived intent to terminate his workers compensation benefits.

Finally, as to Reedy's claim of intentional infliction of emotional distress, WCI asserts that Reedy has not alleged any outrageous conduct by its employees or agents. Rather, WCI reads Reedy's complaint as asserting outrageous conduct by a nurse associated with Reedy's own doctor, not with any doctor employed by WCI. Reedy argues that his complaint is founded in part on the outrageous conduct of a nurse who humiliated him over the non-payment of his bill, when WCI was responsible for that payment, but, more importantly, Reedy alleges that WCI's outrageous conduct was to require him to see various physicians chosen by them, then to deny payment of those physicians' bills. Reedy asserts that the outrageousness of this latter conduct was aggravated by the fact that while WCI was requiring Reedy to obtain treatment, it was compiling his medical records and preparing to terminate his workers compensation benefits. The court turns first to the standards applicable to disposition of WCI's motion for summary judgment.

### A. Standards For Summary Judgment

The Eighth Circuit Court of Appeals recognizes "that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun–Inini v. Sessions*, 900 F.2d 1234, 1238 (8th Cir.1990). On the other hand, the Federal Rules of Civil Procedure have authorized for nearly 60 years "motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Wabun–Inini*, 900 F.2d at 1238 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986)); *Hartnagel v. Norman*, 953 F.2d 394, 396 (8th Cir. 1992).

■■■ The standard for granting summary judgment is well established. *Rule* 56 of the Federal Rules of Civil Procedure states in pertinent part:

Rule 56. Summary Judgment

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon. ... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

*Fed.R.Civ.P.* 56(b) & (c) (emphasis added); *see also Celotex Corp. v. Catrett*, 477 U.S.

317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Beyerbach v. Sears*, 49 F.3d 1324, 1325 (8th Cir.1995); *Munz v. Michael*, 28 F.3d 795, 798 (8th Cir.1994); *Roth v. U.S.S. Great Lakes Fleet, Inc.*, 25 F.3d 707, 708 (8th Cir.1994); *Cole v. Bone*, 993 F.2d 1328, 1331 (8th Cir.1993); *Woodsmith Publishing Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir.1990); *Wabun–Inini*, 900 F.2d at 1238 (citing *Fed.R.Civ.P.* 56(c)).[1] A court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party, here Reedy, and give him the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *Munz v. Michael*, 28 F.3d 795, 796 (8th Cir. 1994); *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir.1994); *Johnson v. Group Health Plan, Inc.*, 994 F.2d 543, 545 (8th Cir.1993); *Burk v. Beene*, 948 F.2d 489, 492 (8th Cir.1991); *Coday v. City of Springfield*, 939 F.2d 666, 667 (8th Cir.1991), *cert. denied*, 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 416 (1992).

■■■ Procedurally, the moving party, here WCI, bears "the initial responsibility of informing the district court of the basis for [its] motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553); *see also Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir.1993). WCI is not required by *Rule* 56 to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.*

■■■ "When a moving party has carried its burden under *Rule* 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at

---

1. An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Beyerbach*, 49 F.3d at 1326; *Hartnagel*, 953 F.2d at 394.

1355. Reedy is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P.* 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach,* 49 F.3d at 1325. Although "direct proof is not required to create a jury question, ... to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" *Metge v. Baehler,* 762 F.2d 621, 625 (8th Cir.1985) (quoting *Impro Products, Inc. v. Herrick,* 715 F.2d 1267, 1272 (8th Cir.1983), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984)), *cert. denied sub nom. Metge v. Bankers Trust Co.,* 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). The necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Allison v. Flexway Trucking, Inc.,* 28 F.3d 64, 66 (8th Cir. 1994).

■ In *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11, *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2552–53, and *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56, the Supreme Court established that a summary judgment motion should be interpreted by the trial court to accomplish its purpose of disposing of factually unsupported claims, and the trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). The trial court, therefore, must "assess the adequacy of the nonmovants' response and whether that showing, on admissible evidence, would be sufficient to carry the burden of proof at trial." *Hartnagel,* 953 F.2d at 396 (citing *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552). If Reedy fails to make a sufficient showing of an essential element of a claim with respect to which he has the burden of proof, then WCI is "entitled to judgment as a matter of law." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552; *Woodsmith,* 904 F.2d at 1247. However, if the court can conclude that a reasonable trier of fact could return a verdict for the nonmovant, then summary judgment should not be granted. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Burk,* 948 F.2d at 492; *Woodsmith,* 904 F.2d at 1247.

■ The Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment-discrimination cases." *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir.1994) (citing *Johnson v. Minnesota Historical Soc'y,* 931 F.2d 1239, 1244 (8th Cir.1991); *Hillebrand v. M-Tron Indus., Inc.,* 827 F.2d 363, 364 (8th Cir.1987), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989)); *see also Hardin v. Hussmann Corp.,* 45 F.3d 262 (8th Cir.1995) ("summary judgments should only be used sparingly in employment discrimination cases," citing *Haglof v. Northwest Rehabilitation, Inc.,* 910 F.2d 492, 495 (8th Cir. 1990); *Hillebrand,* 827 F.2d at 364). Summary judgment is appropriate only in "those rare instances where there is no dispute of fact and where there exists only one conclusion." *Webb v. St. Louis Post–Dispatch,* 51 F.3d 147, 148 (8th Cir.1995) (quoting *Johnson,* 931 F.2d at 1244); *Crawford,* 37 F.3d at 1341 (quoting *Johnson,* 931 F.2d at 1244). The court reasoned that "[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." *Id.* (holding that there was a genuine issue of material fact precluding summary judgment); *Johnson,* 931 F.2d at 1244. With these standards in mind, the court turns next to the facts not in dispute between the parties, and those as to which the parties assert there is a genuine issue.

### B. Findings Of Fact

#### 1. Undisputed facts

On January 22, 1990, Reedy applied for employment with WCI's Laundry Division in

Hamilton County, Iowa. In response to the question, "Have you ever drawn workers' compensation?" Reedy marked the box to answer yes, then elaborated by stating "1984—cracked rib—returned to work in approx. 4 wks." Above the signature line, the application form bore the following:

## PLEASE READ CAREFULLY
## THE STATEMENT BELOW

I understand that any employment with the Company is voluntarily entered into and, if employed, I may resign at any time for any reason. Similarly, the Company may terminate the employment relationship at any time for any reason.

I authorize the investigation of all statements contained in this application, and further authorize the company to contact my past employers. My present employer [ ] May [ ] May Not Be Contacted. I certify that all statements and information are true, and acknowledge that any falsification of these facts is cause for separation from the company's service. Recognizing that a physical examination may disclose matters which would adversely interfere with the performance of my work, I agree to such an examination by a company-designated physician, and understand that my employment is contingent upon that examination.

Reedy acknowledges that he read and understood the application form.[2]

On January 29, 1990, prior to a pre-employment physical examination, Reedy completed a WCI Laundry Medical Information Form giving details of his medical history. In response to an extensive list of items under "Medical History," including back trouble or back pain, broken bones or bone disease, and numbness in a limb, among many other items, Reedy marked "yes" only as to "Operations." In the space provided to explain any affirmative answers, Reedy wrote, "Injured in Viet Nam 1968." In answer to the question requesting that he list all surgical operations, Reedy wrote, "Ab-dominal area (Viet Nam) chest, back." Reedy indicated that he had no physical complaints at that time. Reedy identified as the only time he had been admitted to a hospital, "Viet Nam 1968–1969," indicated that he believed his present health was "good," and that he had been injured at work in 1983 and had missed work for approximately four weeks as the result of a cracked rib. Just above the signature line, which Reedy signed, was the following:

I certify the information herein to be true and correct and understand that any misstatement or misrepresentation/omission of facts provides cause for rejection or dismissal.

Reedy's statements in these forms notwithstanding, in addition to the near-fatal injuries Reedy suffered to his abdomen, lungs, stomach, rectum, chest, shoulders, arms, and back as the result of the nearby explosion of two land mines during his tour in Viet Nam in 1968, Reedy had an extensive medical history. Reedy's medical history included an automobile accident in 1969, resulting in a fractured pelvic bone, facial lacerations, and contusions to the head; back injuries in 1979 or 1980 from heavy lifting in the course of his employment requiring treatment from a chiropractor and other medical doctors; back injuries in 1982 or 1983, resulting in the filing of a workers compensation claim with Mid–Continent Lumber; diagnosis of a ruptured disc and other damage at the L3–L4 lumbar region of his back in 1984 resulting in a lumbar laminectomy in June of 1984; a fall of approximately 14 feet from the second level of a warehouse in 1984 resulting in a cracked rib, as well as back and head injuries, for which Reedy ultimately received a workers compensation settlement of $20,-000;[3] and aggravation of back pain as a truck driver in 1987 or 1988. In addition to these employment related health matters, Reedy injured his back in 1987 while moving his television set, resulting in medical attention from his own physician. In addition to the health problems described above, Reedy

---

2. Reedy did not mark either box regarding contacting his present employer.

3. Reedy was placed on light duties following recuperation from the injuries in the course of his employment in 1983 and 1984.

testified in deposition to rectal bleeding, leg problems, and constipation.

On January 29, 1990, Reedy had a pre-employment physical examination with Dr. Latella, a physician designated by WCI. Dr. Latella did not report that Reedy had any history or other indications of back problems. Reedy was therefore hired by WCI as a general laborer and began working for the Laundry Division on February 5, 1990.

On February 15, 1990, while attempting to lift a piece of solid plate steel, Reedy experienced a "ripping sensation" in his lower back. However, Reedy was laid off work that day, so that he did not report the injury to his employer until some time later. Reedy sought treatment for back pain and pain running down both legs on February 22, 1990, from the local hospital and then from the Veterans Administration Hospital. Reedy reported this back injury in mid-February to his employer only in early March of 1990 when he returned to work at the WCI Laundry Division plant.

On June 13, 1990, Reedy again injured his back at work, this time while attempting to lift a box weighing about 30 lbs. Reedy was treated for this injury by Dr. Latella, WCI's company physician. During this treatment, Reedy and Dr. Latella had a confrontation over whether Reedy had disclosed his prior back problems to the doctor during the pre-employment physical examination. Dr. Latella advised WCI that he had not been informed of these problems. WCI terminated Reedy on June 21, 1990. Reedy's termination letter, from R.C. Kennedy, Manager, Employee Relations, states that Reedy's termination "had become necessary due to our discovery that during your pre-employment application, interview, and physical process a number of facts pertinent to the hiring decision were deleted, falsified and/or misrepresented." Kennedy's letter identified the following inaccurate disclosures: "[p]revious employment related back surgery," "[p]revious hospitalization for back surgery," "10% permanent partial disability rating,"[4] and "[m]edical restrictions which precluded work

that involved heavy lifting, forward bending, and prolonged sitting or standing."

The summary judgment record does not reveal when or how, or even if, WCI was formally advised of Reedy's injury and intent to seek workers compensation benefits. In his deposition, Reedy states that he completed a form concerning his injury for a nurse in Dr. Latella's office that included questions about "what happened, how I hurt myself, where I was working, what I was doing." Reedy Deposition, pp. 110–112. However, that form is not in the summary judgment record, and the court is unable to determine whether it was a notice of injury form referred to by counsel for the parties at oral argument. Nonetheless, although Reedy's employment had been terminated, it is undisputed that WCI initially authorized medical treatment for Reedy's back injury sustained on June 13, 1990, as a work-related injury. However, Reedy was notified that his workers compensation benefits would terminate on August 16, 1990. WCI did in fact terminate those benefits and withdrew its authorization for any further medical treatment.

Reedy sought administrative relief from the termination of his workers compensation benefits through the Iowa Industrial Commission and then in judicial review of those administrative proceedings in Iowa District Court for Polk County. Reedy did not appeal the negative determination of the Iowa District Court. During the pendency of the administrative proceedings, Reedy filed this lawsuit.

### 2. *Disputed facts*

Reedy asserts a number of disputes of fact that he contends are material to the disposition of this lawsuit. Reedy asserts that he has never "admitted" that he intentionally misled WCI concerning his past medical condition. Rather, Reedy asserts that he understood the application form and medical history form to be seeking information only about his present health condition.

---

4. The record reveals that this disability rating was determined by the United States Army as the result of Reedy's wounds in Viet Nam.

Reedy also asserts that he provided WCI with notice of his back problems, both by indicating back injuries in Viet Nam in 1968, and by discussing his back problems with Dr. Latella. Specifically, Reedy states that he explained the long, straight surgical scar on his back, which is different from the pockmark scars caused by his shrapnel wounds, as resulting from disc surgery. Dr. Latella vehemently denies any knowledge or discussion of Reedy's back injuries prior to June 13, 1990. Reedy asserts that it is unreasonable to believe that Dr. Latella could have mistaken the laminectomy scar for a scar from a shrapnel wound. Reedy asserts that Dr. Latella, who was also a Viet Nam veteran, simply became more caught up in reminiscing with Reedy than in making a complete medical report.[5]

Reedy asserts that WCI fired him before contacting counsel for any advice. WCI contends, however, that it contacted counsel concerning termination of Reedy's workers compensation benefits prior to doing so. Reedy asserts that even if WCI contacted counsel concerning termination of his benefits, it was not a good faith consultation, because WCI had already begun gathering Reedy's medical history and had already decided to terminate his employment. There is no dispute that WCI did not contact counsel until after Reedy had been terminated. The record is less clear regarding when WCI contacted counsel concerning termination of Reedy's workers compensation benefits. In deposition, the counsel contacted by WCI, Robert Landess, testified that he had no independent recollection of any contact with WCI concerning Reedy between June and August, and that although he believes he had discussions with WCI about terminating Reedy's benefits, he cannot state with certainty the timing of those discussions in relation to Reedy's filing of a workers compensation claim and the termination of Reedy's workers compensation benefits. *See* Landess Deposition, pp. 19–21, 36, 50–56.

Reedy asserts that termination of his benefits was outrageous, because he had been treated by physicians of WCI's choosing and

at their behest. Reedy also alleges that an altercation he had with a nurse over his unpaid medical bills, which he asserts was humiliating, was the direct result of WCI's refusal to pay benefits.

Finally, Reedy disputes any suggestion that he suffered from "chronic" back pain, as WCI has from time-to-time characterized his back problems. He also denies making any statement that driving a truck aggravated his back pain.

WCI's reply brief attempts to rebut any suggestion that genuine issues of material fact exist, or, that if disputes of fact exist, that they are material. First, WCI argues that whether or not Reedy intentionally misled WCI is not a material issue; the fact that Reedy signed an application and medical history form each containing demonstrably false information concerning Reedy's history of back problems is enough to establish that his termination was reasonable. WCI also argues that there is no evidence, apart from Reedy's assertions, that he ever discussed his back problems with Dr. Latella prior to June 13, 1990. WCI points out that the report generated by the pre-employment physical examination does not indicate any back problems. WCI next asserts that the record demonstrates that it contacted counsel prior to terminating Reedy's workers compensation benefits, and that Reedy cannot show a genuine issue of material fact as to whether or not WCI relied on counsel's advice. Finally, WCI asserts that it had no authority over the nurse who allegedly humiliated Reedy over his unpaid bills, even if her conduct was outrageous.

The court will consider in the pertinent place whether any of the disputes of fact pressed by the parties creates a genuine issue of *material* fact. *See Fed.R.Civ.P.* 56(c); *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Matsushita Elec. Indus. Co.,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56; *Hartnagel,* 953 F.2d at 396.

### C. *Legal Analysis (Including Some Further Findings Of Fact)*

WCI has moved for summary judgment on Reedy's claims of retaliatory discharge in

---

**5.** The parties indicate that Reedy had been recovering from his wounds in a hospital in Viet Nam

in which Dr. Latella was stationed, although neither recalls having any contact with the other.

violation of public policy, bad faith denial of workers compensation benefits, and intentional infliction of emotional distress. The court will consider WCI's grounds for summary judgment on each of Reedy's claims *seriatim.*

### 1. The retaliatory discharge claim
#### a. Recognition of the public policy exception under Iowa law

The Iowa Supreme Court was slow to recognize a cause of action for the wrongful discharge of an at-will employee, instead relying on the general rule that an at-will employee may be terminated at any time, for any reason. *See Abrisz v. Pulley Freight Lines, Inc.,* 270 N.W.2d 454, 455 (Iowa 1978); *Harper v. Cedar Rapids Television Co., Inc.,* 244 N.W.2d 782, 791 (Iowa 1976); *Allen v. Highway Equip. Co.,* 239 N.W.2d 135, 139 (Iowa 1976). In *Northrup v. Farmland Indus., Inc.,* 372 N.W.2d 193 (Iowa 1985), the court stated that

> [t]his court has never expressly recognized a public policy exception [to the employment at will doctrine], although we recently noted its increasing acceptance in other jurisdictions. [Citations omitted].

> While we hinted in *Abrisz* that, under proper circumstances, we would recognize a common-law claim for a discharge violating public policy, we did not apply it there because the facts did not establish such a violation. We observed, moreover, that "[c]ourts should not declare conduct violative of public policy unless it is clearly so." *Abrisz,* 270 N.W.2d at 456. It has been observed, in fact, that successful common-law claims for wrongful discharge have been based in large part on violations of independent statutory policy, not those established by court decisions. *See* Note, *Protecting At–Will Employees [Against Wrongful Discharge: The Duty to Terminate Only in Good Faith],* 93 Harv.L.Rev. at 1822–23.

*Northrup v. Farmland Indus., Inc.,* 372 N.W.2d 193, 196 (Iowa 1985). The court then went on to find an express public policy prohibiting discharges for "disabilities," but

held that a claim of wrongful discharge based on a disability was preempted by the exclusive remedies of Iowa Code Ch. 601A (now Iowa Code Ch. 216). *Id.* As in *Abrisz,* the court again refused to recognize a claim of wrongful discharge in violation of public policy in *Haldeman v. Total Petroleum, Inc.,* 376 N.W.2d 98 (Iowa 1985), because "we simply observe that this case would not fall into such an exception." 376 N.W.2d at 105. In *Haldeman,* the plaintiff's claim of wrongful discharge was based on her discharge as a cashier following discovery of "unexplained shortages." *Id.* In *Cross v. Lightolier Inc.,* 395 N.W.2d 844 (Iowa 1986), the Iowa Supreme Court recognized that jurisdictions were split on whether an action for wrongful discharge under a mandate of public policy is a contract or tort action. 395 N.W.2d at 849. However, the court upheld the trial court's conclusion that plaintiff's claim of breach of an oral contract was a contract and not a tort claim, and reiterated that "[e]mployment at will ... cannot be used as a basis for an action for wrongful discharge or breach of employment contract." *Id.* (quoting *Haldeman,* 376 N.W.2d at 105).

It was not until 1988 that the Iowa Supreme Court recognized a cause of action for discharge that frustrates a well-recognized and defined public policy of the state in the case of *Springer v. Weeks & Leo Co., Inc.,* 429 N.W.2d 558, 560 (Iowa 1988) (hereinafter *Springer I ).*[6] However, the court considered the cause of action to be one of tortious interference with a contract of hire. *Springer I,* 429 N.W.2d at 560. The court later concluded that this characterization "may have been misleading," and cited cases clarifying the court's development and refinement of the tort. *Springer v. Weeks & Leo Co., Inc.,* 475 N.W.2d 630, 632–33 (Iowa 1991) (hereinafter *Springer II ).* The court has construed *Springer I* as holding that if the discharge of an employee at will is in violation of public policy, the employee has a cause of action in tort against the employer. *Smith v. Smithway Motor Xpress, Inc.,* 464 N.W.2d 682, 685 (Iowa 1990); *see also Vaughn v. Ag Processing, Inc.,* 459 N.W.2d

---

6. The opinion in *Springer I* cites no fewer than thirteen other states that had judicially recognized the public policy exception to employment at will.

627, 637 (Iowa 1990) (in *Springer I*, "the court recognized an at-will employee's right to compensation for wrongful discharge in violation of a 'clearly articulated public policy of this state'"); *Fogel v. Trustees of Iowa College*, 446 N.W.2d 451, 455 (Iowa 1989) (citing *Springer I* for the same proposition).

As the law now stands in Iowa, the general rule is still that an at-will employee may be discharged at any time, for any reason, or no reason at all. *Borschel v. City of Perry*, 512 N.W.2d 565, 566 (Iowa 1994); *Lara v. Thomas*, 512 N.W.2d 777, 781 (Iowa 1994); *French v. Foods, Inc.*, 495 N.W.2d 768, 769 (Iowa 1993); *Grahek v. Voluntary Hosp. Co-op. Ass'n of Iowa, Inc.*, 473 N.W.2d 31, 34 (Iowa 1991); *Fogel*, 446 N.W.2d at 455. The court has recognized two exceptions to this general rule in which a cause of action for wrongful discharge of an at-will employee will lie: The first is where the discharge is in clear violation of a "well-recognized and defined public policy of this state," and the second is where a contract is created by an employer's handbook or policy manual. *Borschel*, 512 N.W.2d at 566; *French*, 495 N.W.2d at 769–70; *Fogel*, 446 N.W.2d at 455; *see also Clarey v. K–Products, Inc.*, 514 N.W.2d 900, 902 (Iowa 1994) (court has recognized exception to at-will employment where discharge occurs for reasons contrary to public policy); *Lara*, 512 N.W.2d at 782 (case involved "one of the exceptions," discharge in violation of public policy); *Grahek*, 473 N.W.2d at 34 ("termination of an employment at-will is generally not actionable in the absence of discrimination or a public policy violation."); *Vaughn*, 459 N.W.2d at 638 (public policy exception only discussed); *Niblo v. Parr Mfg., Inc.*, 445 N.W.2d 351, 355 (Iowa 1989) (public policy exception only discussed); *Vaughn v. City of Cedar Rapids*, 527 N.W.2d 411, 413 (Iowa Ct.App.1994) (citing *Fogel* for exceptions of violation of public policy and creation of contract in handbook). The public policy exception is based on the theory that the law should not allow employees to be fired for reasons that violate public policy. *Borschel*, 512 N.W.2d at 567 (citing 82 Am.Jr.2d, *Wrongful Discharge* § 15, at 687 (1992)).

Under the public policy exception, the Iowa Supreme Court has recognized causes of action for tortious discharge where an employer's retaliatory discharge would conflict with certain legislatively declared goals. *Lara*, 512 N.W.2d at 782. Such policies may be expressed in the constitution and the statutes of the state, *Borschel*, 512 N.W.2d at 567 (citing 82 Am.Jr.2d, *Wrongful Discharge* § 19, at 692 (1992)), although enforcement of the tort based on some policies is preempted by enforcement under the statutes embodying those policies themselves:

> The legislature may explicitly prohibit the discharge of an employee who acts in accordance with a statutory right or duty. *See, e.g.,* Iowa Code ch. 216 (1993) (civil rights statute transferred from Iowa Code ch. 601A). Discharge of an employee because of age, race, creed, color, sex, national origin, religion, or disability is an unfair employment practice. Iowa Code § 216.6. Remedies are provided employees who are discharged in violation of the statute. *See* Iowa Code § 216.15. Our civil rights statute, however, preempts an employee's claim that the discharge was in violation of public policy when the claim is premised on discriminatory acts. *Hamilton v. First Baptist Elderly Hous. Found*, 436 N.W.2d 336, 341–42 (Iowa 1989).

*Borschel*, 512 N.W.2d at 567–68. The *Borschel* court then identified the circumstances in which Iowa courts had found a public policy basis for the tort:

> In the absence of an express prohibition, the court of appeals found an implied cause of action for wrongful termination when the reason for discharge is the employee's failure or refusal to violate a law in the course of employment. *Wilcox v. Hy–Vee Food Stores, Inc.*, 458 N.W.2d 870, 872 (Iowa App.1990). The court of appeals found that the violation of a statute prohibiting an employer from requiring an employee to take a polygraph examination was a violation of public policy, thus a private cause of action existed. *Id.* at 872. At the time the claim arose the statute did not expressly allow for a cause of action. This statute was later amended to so provide. *Id.*

Also we have found an implied prohibition against retaliatory discharge based on an employee's exercise of a right conferred by a clearly articulated legislative enactment. *See Lara v. Thomas,* 512 N.W.2d 777, 780 (Iowa 1994) (discharge in retaliation for filing partial unemployment claim); *Niblo v. Parr Mfg., Inc.,* 445 N.W.2d 351, 353 (Iowa 1989) (employee discharged because she threatened to file a workers' compensation claim); *Springer [I],* 429 N.W.2d at 560 (cause of action exists when the employee's discharge serves to frustrate the public policy expressed in the workers' compensation statute).

*Borschel,* 512 N.W.2d at 568. A wrongful or retaliatory discharge in violation of public policy is therefore an intentional wrong committed by the employer against an employee who chooses to exercise some substantial right. *Niblo,* 445 N.W.2d at 355 (citing *Perks v. Firestone Tire & Rubber Co.,* 611 F.2d 1363, 1366 (3d Cir.1979)). The remedy for the tort should be for the employee's complete injury, including out-of-pocket loss of income and causally connected emotional harm. *Id.*

### b. *Discharge interfering with workers compensation rights*

██ The case in which the Iowa Supreme Court first recognized a public policy exception to the at-will employment doctrine was in fact a case in which the plaintiff claimed to have been discharged for filing a workers compensation claim. *Springer I,* 429 N.W.2d at 560. It is not necessary under Iowa law that the plaintiff ever actually *file* a workers compensation claim, if the termination interferes with the employee's right to file such a claim. *Niblo,* 445 N.W.2d at 353. In *Niblo,* the Iowa Supreme Court held that a jury could deduce that the plaintiff was fired for merely wanting to or threatening to file a workers compensation claim where the representative of the company told the employee that he was not going to pay workers compensation benefits for a skin condition that was allegedly work-related, that he did not believe that the employee's skin problem was his fault or "factory related," and that he was not going to pay to have the employee's face worked on at all, and, at the conclusion of

this outburst, the representative fired the employee. *Niblo,* 445 N.W.2d at 353. Similarly, the court found the evidence sufficient to support a jury verdict in favor of plaintiff on plaintiff's claim of retaliatory discharge for filing a workers compensation claim where

plaintiff submitted evidence of tardy payment of workers' compensation benefits by K–Products, disparaging comments by company officials concerning claims for workers' compensation, and the testimony of several employees that they had been harassed following their filing of workers' compensation claims.

Also, evidence that K–Products gave inconsistent reasons for her discharge supported the plaintiff's theory, and there was testimony by the company's doctor that he believed the company was intentionally "slowing things down" in processing workers' compensation claims.

*Clarey,* 514 N.W.2d at 902.

██ In *Springer II,* the Iowa Supreme Court identified the elements of the public policy exception claim when based upon discharge in retaliation for seeking workers compensation benefits as follows:

Plaintiff must prove all of the following propositions:

1. Plaintiff was an employee of defendant.

2. Defendant discharged plaintiff from employment.

3. Defendant discharged plaintiff because she filed a workers compensation claim.

4. The discharge was a proximate cause of damage to the plaintiff.

5. The nature and extent of the damage.

If the plaintiff has failed to prove any of these propositions, the plaintiff is not entitled to damages. If the plaintiff has proven all of these propositions, then the plaintiff is entitled to damages.

*Springer II,* 475 N.W.2d at 633 (citing Iowa Civil Jury Instruction 3100.1). The court recognized further that a growing number of courts and legislatures have recognized a public policy exception to an employer's right to discharge an at-will employee for asserting statutory workers compensation rights. *Id.*

(citing Annotation, *Recovery for Discharge from Employment in Retaliation for Filing Workers' Compensation Claim*, 32 A.L.R.4th 1221 (1984); Note, *Employment at Will in Iowa: Is it the Rule or the Exception?*, 39 Drake L.Rev. 157, 160 (1989–90)).

### c. Reedy's retaliatory discharge claim

█ In the present case, WCI asserts that there is no genuine issue of material fact that Reedy, whether intentionally or not, made false statements on his application and health forms, and that WCI terminated Reedy for making those misrepresentations, not for seeking workers compensation benefits or appearing likely to do so. Reedy vehemently denies that he intentionally misrepresented his health condition, asserting a genuine issue of material fact as to his intent on the ground that he understood the application and health form to be asking only about his present condition. Certainly, Reedy's assertion of a genuine issue of material fact on intentional misrepresentation misses the point,[7] but the court does not agree that there is no genuine issue of material fact presented by the record such that summary judgment may be entered in favor of WCI.

█ The element of his claim Reedy must prove, and on which the court finds that there is a genuine issue of material fact, is that WCI fired Reedy to interfere with his workers compensation rights or in retaliation for his seeking workers compensation benefits. *Springer II*, 475 N.W.2d at 633 (citing Iowa Civil Jury Instruction 3100.1). Like the plaintiff in *Niblo*, Reedy has presented evidence that he was fired when he first indicated a need or desire for workers compensation benefits. *Niblo*, 445 N.W.2d at 353. Like the plaintiff in *Clarey*, Reedy has also presented evidence of tardy payment of workers' compensation benefits by his employer. *Clarey*, 514 N.W.2d at 902. Furthermore, Reedy has presented evidence that WCI did have some notice of his back problems, evidence WCI itself disputes, but took no action to discipline him for any misrepresentations in his application and health forms until he actually appeared likely to run up medical bills and seek workers compensation benefits. One implication of any delay after receiving notice of misrepresentations in the application or health forms is that WCI decided to ignore those misrepresentations until health problems for which it might be required to pay manifested themselves. *Metge*, 762 F.2d at 625 ("direct proof is not required to create a jury question").[8] Reedy

---

7. The general rule in Iowa is still that an at-will employee may be discharged at any time, for any reason, or no reason at all. *Borschel*, 512 N.W.2d at 566; *Lara*, 512 N.W.2d at 781; *French*, 495 N.W.2d at 769; *Grahek*, 473 N.W.2d at 34; *Fogel*, 446 N.W.2d at 455. Thus, whether Reedy provided WCI with a better reason for firing him, because he intentionally misrepresented his health condition, than merely some reason, because there are undeniably misrepresentations on the application and health forms, is simply not a determinative issue on this claim. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Beyerbach*, 49 F.3d at 1326; *Hartnagel*, 953 F.2d at 394. The governing law here makes the issue that might affect the outcome of the suit on this claim whether or not WCI fired Reedy for appearing likely to file a workers compensation claim or seeking workers compensation benefits, not whether he lied in his employment application. *Springer II*, 475 N.W.2d at 633. Nor is the court's belief that Reedy's explanation for the misrepresentations on his application and health form strains credibility sufficient to grant WCI's motion for summary judgment. *Johnson*, 906

F.2d at 1237 (trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial).

8. The court is aware that another implication of WCI's delay in terminating Reedy until he actually appeared likely to require workers compensation benefits is that it was not until that time that WCI had any notice of Reedy's misrepresentations of his health condition, and therefore no reason to invoke those misrepresentations as grounds for his discharge, and that WCI merely followed up on the warnings in both the application form and the health form which notified Reedy that misrepresentations, or even omissions of fact, were grounds for dismissal. In *Springer II*, upon retrial, claims and defenses similar to those offered here were made. *Springer II*, 475 N.W.2d at 633. The employee asserted that she had been fired for seeking workers compensation benefits for carpal tunnel syndrome, but the employer argued that she had been fired for misrepresenting the cause of her carpal tunnel syndrome. *Id.* The question of the real reason for the discharge was submitted to the jury, and the court properly admitted evidence, letters from the plaintiff's doctor, that supported the employ-

has met his burden under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial," *Fed.R.Civ.P.* 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach,* 49 F.3d at 1325, by pointing to his health form, which does indeed indicate operations to his "back," although somewhat vaguely, and his deposition testimony that he discussed his back surgeries extensively with Dr. Latella during his pre-employment examination. The court believes it is for the jury to decide which reason, misrepresentations or seeking workers compensation benefits, prompted WCI to discharge Reedy. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510 (nonmoving parties' burden is only to produce sufficient evidence "such that a reasonable jury could return a verdict for the nonmoving party."); *Allison,* 28 F.3d at 66. WCI is not entitled to summary judgment on Reedy's claim of retaliatory discharge in violation of public policy as an attempt to interfere with or retaliate for Reedy's right to claim workers compensation benefits. The court therefore turns to consideration of WCI's grounds for summary judgment on Reedy's second claim.

### 2. The "bad faith" claim

WCI asserts two grounds for summary judgment on Reedy's claim of bad faith failure to pay workers compensation benefits: first, that the claim was "fairly debatable," and therefore WCI was entitled to debate it; and, second, that WCI obtained the advice of counsel before terminating Reedy's benefits, thus establishing that the termination was in good faith. Reedy denies the validity of either ground. He argues that WCI cannot show that WCI had a reasonable basis for

denying benefits on the basis of his alleged misrepresentations on his application and health forms, and that there is at least a genuine issue of material fact as to whether or not WCI contacted counsel in good faith concerning termination of his benefits, or whether they contacted counsel with the preconceived intention to terminate his benefits.

### a. The bad-faith cause of action under Iowa law

 In *Dolan v. Aid Ins. Co.,* 431 N.W.2d 790 (Iowa 1988), the Iowa Supreme Court recognized a first-party bad faith cause of action. *Johnson v. Farm Bureau Mut. Ins. Co.,* 533 N.W.2d 203 (Iowa 1995);[9] *Stahl v. Preston Mut. Ins. Ass'n,* 517 N.W.2d 201, 203 (Iowa 1994); *White v. Northwestern Bell Telephone Co.,* 514 N.W.2d 70, 77 (Iowa 1994); *Dolan,* 431 N.W.2d at 791. Insurance contracts, the court has held, contain an implied covenant of good faith that "neither party will do anything to injure the rights of the other in receiving the benefit of the agreement." *Johnson,* 533 N.W.2d at 207; *Kooyman v. Farm Mut. Ins. Co.,* 315 N.W.2d 30, 33 (Iowa 1982). The court adopted the tort, because "'traditional damages for breach of contract will not always adequately compensate an insured for an insurer's bad faith conduct.'" *Stahl,* 517 N.W.2d at 203 (quoting *Dolan,* 431 N.W.2d at 794; and citing *Nassen v. National States Ins. Co.,* 494 N.W.2d 231 (Iowa 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1846, 123 L.Ed.2d 470 (1993)). The court explained that

"the nature of the contractual relationship between the insurer and insured" justified this conclusion. *Dolan,* 431 N.W.2d at 794. Though we declined to recognize a fiduciary relationship in first-party situations, we determined that a bad faith tort would serve to redress the "inherently unequal

er's position. *Id.* Similarly, the real reason here, Reedy's misrepresentations or need for workers compensation benefits, is a fact question for the jury.

**9.** The Iowa Supreme Court had previously adopted the tort of third-party bad faith, in which an insurer is alleged to have refused in bad faith to settle a third party's claim against the insured within the policy limits, thus exposing the insured to monetary liability exceeding policy lim-

its. *Johnson,* 533 N.W.2d at 207. First-party bad faith claims, on the other hand, involve an insured's attempt to recover for his or her own losses allegedly covered by the insurance policy. *Id.* at 207. In *Johnson,* the court rejected recognition of a claim of "reverse bad faith," which would be a cause of action in favor of insurers when an insured brings a frivolous bad faith claim against the insurer. *Id.* at 206, 208.

bargaining power" between the insurer and the insured. *Id.*

*Stahl,* 517 N.W.2d at 203. The court has also noted that the unequal bargaining power in question arises from the fact that insurance policies are contracts of adhesion. *White,* 514 N.W.2d at 77; *Dolan,* 431 N.W.2d at 794.

The Iowa Supreme Court has specifically recognized a cause of action for bad faith denial of workers compensation benefits. *Squealer Feeds v. Pickering,* 530 N.W.2d 678, 683 (Iowa 1995) (citing *Brown v. Liberty Mutual Ins. Co.,* 513 N.W.2d 762 (Iowa 1994)); *White,* 514 N.W.2d at 77 (citing *Boylan v. American Motorists Ins. Co.,* 489 N.W.2d 742, 744 (Iowa 1992)); *Brown v. Liberty Mutual Ins. Co.,* 513 N.W.2d 762, 764 (Iowa 1994); *Boylan v. American Motorists Ins. Co.,* 489 N.W.2d 742, 744 (Iowa 1992). Such a claim accrues when the claimant receives notice of the insurer's refusal to pay. *Squealer Feeds,* 530 N.W.2d at 683; *Brown,* 513 N.W.2d at 764. Bad faith failure to pay workers compensation claims is not a continuing tort, *Squealer Feeds,* 530 N.W.2d at 683; *Brown,* 513 N.W.2d at 764, although a denial may be supportable at the time it is made, but later lack a reasonable basis in the light of subsequent information. *Squealer Feeds,* 530 N.W.2d at 683; *Dirks v. Farm Bureau Mut. Ins. Co.,* 465 N.W.2d 857, 860 (Iowa 1991). In the decision of the Iowa Supreme Court upon certified questions from this court in this case, the court held that bad-faith liability may also extend to self-insured employers. *Reedy v. White Consolidated Indus., Inc.,* 503 N.W.2d 601, 603 (Iowa 1993); *see White,* 514 N.W.2d at 77 (citing *Reedy* for this proposition). Implicit in the adoption of the tort as applicable to self-insured employers is "the idea that employees of qualified self-insured employers suffer from the same unequal bargaining power prompting [the court's] decision in *Dolan.*" *White,* 514 N.W.2d at 77 (explaining *Reedy,* 503 N.W.2d at 602–03).

In order to prevail on a first-party bad faith claim as that tort has been adopted by the Iowa Supreme Court, the plaintiff insured must show the following: (1) the absence of a reasonable basis for denying benefits of the insurance coverage; and (2) that the defendant insurer knew or had reason to know that its denial was without basis. *Morgan v. American Family Ins. Co.,* 534 N.W.2d 92, 96–97 (Iowa 1995); *Stahl,* 517 N.W.2d at 201; *White,* 514 N.W.2d at 77; *Wetherbee v. Economy Fire & Cas. Co.,* 508 N.W.2d 657, 661–62 (Iowa 1993); *Reuter v. State Farm Mut. Auto. Ins. Co.,* 469 N.W.2d 250, 253 (Iowa 1991) (explaining history of this two-part test under Iowa law);[10] *Central Life Ins. v. Aetna Casualty & Surety Co.,* 466 N.W.2d 257, 263 (Iowa 1991); *Dirks v. Farm Bureau Mut. Ins. Co.,* 465 N.W.2d 857, 860 (Iowa 1991); *Kiner v. Reliance Ins. Co.,* 463 N.W.2d 9, 13 (Iowa 1990); *Dolan,* 431 N.W.2d at 794. Where an insurance claim is "fairly debatable," the bad faith claim must fail. *Morgan,* 534 N.W.2d at 96–97; *Stahl,* 517 N.W.2d at 203; *Clark–Peterson v. Independent Ins. Assoc.,* 514 N.W.2d 912, 914 (Iowa 1994); *Reuter,* 469 N.W.2d at 253–54 ("[W]e have consistently stated that where a claim is 'fairly debatable,' the insurer is entitled to debate it," citing cases applying this standard both before and after the adoption of the first-party bad faith tort in *Dolan* ); *Wetherbee,* 508 N.W.2d at 662 ("A reasonable basis to deny a claim exists when the claim is fairly debatable"); *Dirks v. Farm Bureau Mut. Ins. Co.,* 465 N.W.2d 857, 861 (Iowa 1991); *Kiner,* 463 N.W.2d at 12; *Kirk v. Farm & City Ins. Co.,* 457 N.W.2d 906, 910 (Iowa 1990); *Dolan,* 431 N.W.2d at 794. An insurer is entitled to debate a "fairly debatable" claim whether the debate concerns a matter of fact or law. *Central Life Ins. Co.,* 466 N.W.2d at 263; *Dolan,* 431 N.W.2d at 794. A claim may initially be "fairly debatable," and thus the insurer may have a reasonable basis for denial of the claim, but the insurer may become aware at a later date that the claim is no longer "fairly debatable," and that it no longer has a reasonable basis for denying the claim. *Dirks,* 465 N.W.2d at 862 (but finding that insurer in that case still had sufficient basis to dis-

---

**10.** In *Reuter,* the court observed that the first element, reasonable basis, "is an objective element; the insurer's knowledge of the absence is a subjective element." *Reuter,* 469 N.W.2d at 253.

pute liability even in light of additional information).

 The "fairly debatable" test used by the Iowa Supreme Court from the adoption of the tort in *Dolan* has "required the plaintiff to establish to the satisfaction of a reasonable fact finder that [the insured's] decision [to deny benefits] was not based on an honest and informed judgment." *Nassen,* 494 N.W.2d at 236; *see also Kiner,* 463 N.W.2d at 12 (issue of whether claim was "fairly debatable" was for the jury, where a reasonable factfinder could conclude that the insurer failed to exercise an honest and informed judgment in denying the claim, and thus, could conclude that the insurer's denial was not fairly debatable, but finding the "fairly debatable" test in *Anderson v. Continental Ins. Co.,* 85 Wis.2d 675, 692, 271 N.W.2d 368, 377 (1978), the seminal case upon which *Dolan* relied). Thus, in *Nassen,* the court determined that the defendant insurer's investigation of the claim, including examining its own claims file and proffered information from the plaintiff insured, was relevant to deciding whether the claim was "fairly debatable." *Id.* The Iowa Supreme Court has held, however, that in order to prove the crucial element of knowledge, "an improper investigation, standing alone, is not sufficient cause for recovery if the insurer in fact has an objectively reasonable basis for denying the claim." *Stahl,* 517 N.W.2d at 203; *Reuter,* 469 N.W.2d at 254–55.

### b. Jury question or question of law?

Who decides whether the defendant had a "reasonable" basis for denial of the claim, the court as a matter of law or the jury, and the circumstances under which the decision properly belongs to the court or the jury, are vexing questions under Iowa law. For example, in *Wetherbee,* the court stated baldly that "[w]hether a claim is fairly debatable in any given situation is appropriately decided by the court as a matter of law." *Wetherbee,* 508 N.W.2d at 662. The court found that the claim for benefits in that case was "fairly debatable," and therefore upheld the district court's grant of summary judgment in favor of the insurer on the insured's bad faith claim. *Id.* Similarly, in *Reuter,* the court

held that "[i]f an objectively reasonable basis for denial of a claim actually exists, the insurer, as a matter of law, cannot be held liable for bad faith." *Reuter,* 469 N.W.2d at 254. The court agreed with the trial court that the claim in question was "fairly debatable," and therefore the insurer had an objectively reasonable basis for not paying the claim. *Id.* at 255. The court held that the trial court properly directed a verdict in favor of the insurer where the insured had failed to produce sufficient evidence that the insurer had no reasonable basis for refusing to pay the claim. *Id.; see also Central Life Ins. Co.,* 466 N.W.2d at 263 (reversing jury determination of bad faith, finding that insurer had an objectively reasonable basis for its denial, and judgment should therefore have been entered for the insurer as a matter of law); *Dirks,* 465 N.W.2d at 862 (trial court properly granted judgment notwithstanding the verdict, concluding that there was no substantial evidence to support the jury's finding that the insurer lacked a reasonable basis for denying the insured's claim, where claim was initially denied for valid reasons, including conflicting information about accident, thus making claim "fairly debatable.").

These decisions must be contrasted, for example, with the decision in *Nassen,* 494 N.W.2d at 236. In *Nassen,* the court found that where the insurer had ignored crucial information in the company's own claims file, and had "shunned any information that plaintiff's representatives sought to provide on this question," the question of bad faith was for the jury to decide. *Nassen,* 494 N.W.2d at 236; *see also Kiner,* 463 N.W.2d at 12 (issue of whether claim was "fairly debatable" was for the jury, where a reasonable factfinder could conclude that the insurer failed to exercise an honest and informed judgment in denying the claim, and thus, could conclude that the insurer's denial was not fairly debatable).

Two recent decisions of the Iowa Supreme Court support the conclusion that whether a claim is "fairly debatable" is indeed a question for the court to decide as a matter of law. In *Clark–Peterson v. Independent Ins. Assoc.,* 514 N.W.2d 912 (Iowa 1994), the Iowa

Supreme Court held that, where the claims in an action constitute bad-faith claims,

> the matter could properly be determined as a matter of law. In a bad-faith action, where "an objectively reasonable basis for denial of a claim exists, the insurer, as a matter of law, cannot be held liable for bad faith." *Reuter v. State Farm Mut. Ins. Co.*, 469 N.W.2d 250, 254 (Iowa 1991). That is, where coverage is "reasonably debatable" the insurer is free to debate it. This is true because the insurer has the right to have its rights adjudicated without being subject to tort claims. *See Hilde v. United States Fire Ins. Co.*, 184 Ga.App. 611, 612, 362 S.E.2d 69, 71 (1987).

*Clark–Peterson*, 514 N.W.2d at 914. This decision seems to support the conclusion that the court may decide as a matter of law that where coverage is "reasonably debatable," or "fairly debatable," the insurer has an objectively reasonable basis for denial of a claim, and may be granted summary judgment, because it cannot be held liable for bad faith refusal to pay benefits.

The most recent decision of the Iowa Supreme Court suggests even more plainly that whether a claim is "fairly debatable" is a question for the court. In *Morgan v. American Family Insurance*, 534 N.W.2d 92 (Iowa 1995), the court, citing *Wetherbee*, reiterated that "[w]hether a claim is fairly debatable is appropriately decided by the court as a matter of law." *Morgan*, 534 N.W.2d at 96–97. The court continued,

> The absence of a reasonable basis for denying the claim is an objective element. *Reuter v. State Farm Mut. Auto. Ins. Co.*, 469 N.W.2d 250, 253 (Iowa 1991). Where an objectively reasonable basis for denial of a claim actually exists, the insurer cannot be held liable for bad faith as a matter of law. *Id.*

*Id.* In this case, the court noted that the parties agreed that the evaluations of medical doctors provided a reasonable basis for denial *at the time of trial,* but disagreed as to whether there was any reasonable basis at the time the claim was denied. *Id.* Based on undisputed evidence that the plaintiff had not sought medical treatment for seventeen months, and at the time of the accident had not complained of any of the symptoms on which she subsequently based her claim for insurance coverage, the court held that the claim was "fairly debatable." *Id.* at 97. The court therefore held that "the trial court erred in not granting the [insurer's] motion for a directed verdict on the bad faith claim," and should not have submitted it to the jury. *Id.*

However, these Iowa decisions must be contrasted with the result in a federal decision interpreting Iowa law with which this court is intimately familiar, *Chadima v. National Fidelity Life Ins. Co.*, 848 F.Supp. 1418 (S.D.Iowa 1994), *rev'd,* 55 F.3d 345 (8th Cir.1995).[11] In *Chadima*, the district court concluded that it must decide as a matter of law whether the underlying claim was fairly debatable and that it was impermissible to submit that question to the jury. *Chadima*, 848 F.Supp. at 1433. Finding that the claim in that case was fairly debatable, the court entered judgment as a matter of law in favor of the defendant insurer on the plaintiff's bad-faith claim. However, the Eighth Circuit Court of Appeals reversed that decision in *Chadima v. National Fidelity Life Ins. Co.*, 55 F.3d 345 (8th Cir.1995).

■ The Eighth Circuit Court of Appeals, after surveying the Iowa cases discussed above,[12] observed that

> [a]lthough the statement in *Wetherbee* that whether a claim is fairly debatable is a question of law for the court to decide is inconsistent with statements in *Kiner* and *Nassen*, we do not believe the cases are irreconcilable. *Wetherbee* can be read as giving the trial court the opportunity to decide as a matter of law in the appropri-

---

11. I tried this action in accordance with the provisions of 28 U.S.C. § 636(c) while a magistrate judge in the Southern District of Iowa prior to my appointment as a district judge in this district.

12. The Eighth Circuit Court of Appeals did not discuss the decisions in *Stahl*, 517 N.W.2d at 201; *White*, 514 N.W.2d at 77; *Clark–Peterson*, 514 N.W.2d at 914, and, of course, *Morgan*, 534 N.W.2d at 96–97, in its ruling, however, because the latest case decided prior to trial in *Chadima* was *Wetherbee*, 508 N.W.2d at 661.

ate circumstances whether the insurer had a reasonable basis for denying the claim, but not mandating the court to do so. For example, the insurer in *Wetherbee* denied the insured's loss of consortium claim based on its interpretation of the governing policy and Iowa's underinsured motorist statute. 508 N.W.2d at 658–59. The trial court concluded that no coverage existed under the insurance policy, and thus, as a matter of law, the insurer could not be liable for bad faith. *Id.* at 661 . . . .

The cases cited by [the insurer] do not require the court to first determine as a matter of law whether the insured's position is fairly debatable. [The insurer's] interpretation of Iowa law as requiring the court to first decide whether the insurer had an objectively reasonable basis for denying a claim is really only the flip-side of whether the insured has met its burden of producing evidence that the insurer has no reasonable basis for denying the claim. The cases cited by [the insurer] hold that the insurer was entitled to judgment as a matter of law because the insured produced no evidence upon which a jury could find that the insurer lacked a reasonable basis for denying the claim. [Citations omitted.] When there is no evidence from which a reasonable juror could make a necessary finding, the insurer is entitled to judgment as a matter of law . . . .

If the insurer has an "objectively reasonable" explanation for its denial, the insurer may be entitled to summary judgment or a directed verdict on a bad faith claim. In such a case, the reasons supporting the insurer's denial cannot be the subject of a

genuine factual dispute. Otherwise, . . . an insurer could avoid bad faith liability simply by relying on the after-the-fact explanation of its own claims personnel.

*Chadima,* 55 F.3d at 349. Thus, the question for this court in this case is, does WCI have an objectively reasonable explanation for its denial of Reedy's claim that is not the subject of a genuine factual dispute? [13]

### c. *Reedy's bad-faith claim*

■ In this case, WCI has offered as an objectively reasonable explanation for its denial of Reedy's claim Reedy's misrepresentations on his application and health forms. Applying the standards for evaluating this explanation found in *Kiner* and *Nassen,* the cases upon which the Eighth Circuit Court of Appeals principally relied, the court must decide whether WCI's decision that Reedy's claim was "fairly debatable" was based on the exercise of honest and informed judgment. *Nassen,* 494 N.W.2d at 236; *Kiner,* 463 N.W.2d at 12. If a reasonable factfinder could conclude that the insurer failed to exercise an honest and informed judgment in denying the claim, and thus, could conclude that the insurer's denial was not fairly debatable, a jury question is generated on Reedy's bad faith claim. *Id.; Kiner,* 463 N.W.2d at 12.

■ WCI asserts that neither the law in Iowa nor the law in other states is settled on the question of whether an insured's misrepresentations concerning the insured's medical history, intentional or otherwise, on an application form or health history provide ade-

---

13. Although the most recent decision from the Iowa Supreme Court, *Morgan,* again suggests that the court may decide as a matter of law whether a claim is fairly debatable, it too could be construed as applicable only to a situation in which the reasons supporting the insurer's denial were not the subject of a genuine factual dispute. This court believes that a claim may be fairly debatable where there is no factual dispute about what the insurer's reasons were, even if there is a dispute as to the facts upon which those reasons are based, and hence about the validity of the reasons given. Nonetheless, the court feels constrained to follow controlling precedent in this circuit as it understands it.

This court is frustrated by the Iowa Supreme Court's failure in *Morgan,* a decision filed on June 21, 1995, to address explicitly the Eighth Circuit Court of Appeals' decision in *Chadima,* a decision filed a little over a month earlier, on April 26, 1995, and to resolve for itself precisely what part of the first-party-bad-faith cause of action may be determined by the court and under what circumstances. The federal courts must continue to wait for guidance from the Iowa Supreme Court on an issue it has identified, but which is plainly a matter of Iowa law. Had this case not already languished unresolved for several years, the court might have considered certifying an appropriate question to the Iowa Supreme Court to resolve the apparent inconsistencies between state and federal readings of Iowa law.

quate grounds for denial of workers compensation benefits. WCI asserts that in order to resolve its concern about whether or not Reedy's misrepresentations were sufficient ground to deny benefits, it contacted its workers compensation counsel. That counsel advised that whether the insured's misrepresentations about his past health history constituted grounds for denying benefits was at least fairly debatable, with significant support in the law of various states. WCI thus appears to argue that its decision to deny Reedy benefits was the result of honest and informed judgment.

Reedy, however, counters that the judgment was neither honest nor informed. Reedy asserts that WCI did not seek counsel's advice until it had already decided to terminate his benefits, and thus, the advice of counsel defense was merely an after-the-fact justification for a decision already made. Reedy also asserts that WCI's only ground for arguing its judgment was informed is that it contacted counsel prior to making that decision, but because Reedy asserts a genuine issue of material fact as to whether the decision to terminate Reedy's benefits was made prior to seeking advice of counsel, and as to whether WCI had already terminated those benefits even before seeking advice of counsel, there is also a genuine issue of material fact as to whether WCI's decision was informed.[14]

The court finds that there is a genuine issue of material fact as to the timing of WCI's resort to advice of counsel as compared to its notification of Reedy that his benefits would be terminated. Thus, a reasonable factfinder could conclude that WCI failed to exercise an honest and informed judgment in denying Reedy's claim, and therefore could conclude further that WCI's assertion that Reedy's entitlement to benefits

was not fairly debatable and its termination of those benefits was not objectively reasonable at the time the termination decision was made. *Nassen*, 494 N.W.2d at 236; *Kiner*, 463 N.W.2d at 12. A jury question has therefore been generated.

Although it is perhaps a close call on the present record, and proof at trial may be insufficient to establish the lack of an honest and informed judgment on WCI's part, WCI is not entitled to summary judgment on Reedy's claim of first-party bad faith. The court therefore turns to WCI's assertion that it is entitled to summary judgment on Reedy's claim of intentional infliction of emotional distress.

### 3. The intentional infliction of emotional distress claim

Reedy's third claim, upon which WCI also seeks summary judgment, is a claim of intentional infliction of emotional distress. WCI has moved for summary judgment on this claim on the ground that there is no allegation of outrageous conduct attributable to it. The court begins its consideration of WCI's motion for summary judgment on this claim, as with the others, by considering the law applicable to the claim.

#### a. Elements of the tort

The elements for recovery on the common law tort of intentional infliction of emotional distress in Iowa are:

(1) outrageous conduct by the defendant;

(2) the defendant's intentional causing, or reckless disregard of the probability of causing emotional distress;

(3) plaintiff suffered severe or extreme emotional distress;

14. At oral argument, counsel for Reedy for the first time suggested that there was also a genuine issue of material fact as to whether WCI made a full disclosure to its counsel concerning the facts of Reedy's case, the status of his termination, or the status of termination of his benefits. Reedy suggests that this raises a further issue of WCI's "good faith" in its consultation of counsel. While proof at trial might bear out this assertion, Reedy had not designated parts of the record to support it. Neither has WCI addressed this point concerning what material it disclosed to Mr. Landess in asserting its good faith reliance on counsel defense in its motion for summary judgment. The court is unwilling to construe Reedy's "timing" arguments as supporting its "good faith" disclosure argument. Because neither party has fully addressed the question of what WCI disclosed to Mr. Landess, and because the court finds other genuine issues of material fact precluding summary judgment, this court offers no opinion on that issue.

(4) actual and proximate cause of the emotional distress by the defendant's conduct.

*Millington v. Kuba*, 532 N.W.2d 787, 793 (Iowa 1995); *Marks v. Estate of Hartgerink*, 528 N.W.2d 539, 546 (Iowa 1995); *Cutler v. Klass, Whicher & Mishne*, 473 N.W.2d 178, 183 (Iowa 1991); *Vaughn v. Ag Processing, Inc.*, 459 N.W.2d 627, 635–36 (Iowa 1990); *Vinson v. Linn–Mar Community Sch. Dist.*, 360 N.W.2d 108, 118 (Iowa 1984). WCI has challenged the sufficiency of Reedy's complaint as a matter of law only on the ground that Reedy has not alleged sufficiently outrageous conduct attributable to WCI, without addressing whether or not Reedy can make a sufficient showing of emotional distress.

### b. The outrageousness of defendant's conduct

■■■■■ The Iowa Supreme Court has said that when a plaintiff brings a claim of intentional infliction of emotional distress, "It is for the court to determine in the first instance whether the defendants' conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Marks*, 528 N.W.2d at 546; *Cutler v. Klass, Whicher & Mishne*, 473 N.W.2d 178, 183 (Iowa 1991) ("it is for the court to determine in the first instance, as a matter of law, whether the conduct complained of may reasonably be regarded as outrageous."); *Mills v. Guthrie County Rural Elec. Coop. Ass'n*, 454 N.W.2d 846, 849 (Iowa 1990); *M.H. by and through Callahan v. State*, 385 N.W.2d 533, 540 (Iowa 1986); *Reihmann v. Foerstner*, 375 N.W.2d 677, 681 (Iowa 1985); *Vinson v. Linn–Mar Community School Dist.*, 360 N.W.2d 108, 118 (Iowa 1984); *Roalson v. Chaney*, 334 N.W.2d 754, 756 (Iowa 1983). The Iowa Supreme Court has required an extreme of egregiousness to elevate (or downgrade) mere bad conduct to the level of outrageousness. *Northrup v. Farmland Indus., Inc.*, 372 N.W.2d 193, 198 (Iowa 1985). For conduct to be outrageous, it must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Marks*, 528 N.W.2d at 546 (quoting *Vinson*); *Cutler*, 473 N.W.2d at 183 (citing *Vaughn*, 459 N.W.2d at 636);

*Engstrom v. State*, 461 N.W.2d 309, 320 (Iowa 1990) (quoting *Vinson*); *Harsha v. State Sav. Bank*, 346 N.W.2d 791, 801 (Iowa 1984) (quoting Restatement (Second) of Torts § 46 comment d (1965)); *Vinson*, 360 N.W.2d at 118. Indeed, the Iowa court has said that

[t]he tort law should encourage a certain level of emotional toughness. "The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind." Restatement (Second) of Torts § 46, comment d, *supra*. "Against a large part of the frictions and irritations and clashing of temperaments incident to participation in a community life, a certain toughening of the mental hide is a better protection than the law could ever be." Magruder, Mental and Emotional Disturbance in the Law of Torts, 49 Harv.L.Rev. 1033, 1035 (1936).

*Northrup*, 372 N.W.2d at 198–99 (quoting *Meyer v. Nottger*, 241 N.W.2d 911, 918 (Iowa 1976)). Peculiar susceptibility, by reason of physical or mental condition of the person affected, is a factor in considering whether conduct is outrageous, although "major outrage" is always the crucial element of the tort. *Cutler*, 473 N.W.2d at 183 (quoting Restatement (Second) of Torts § 46, comment f). In *Northrup*, the court quoted extensively from the Restatement (Second) of Torts § 46, comment d, for a statement of the level of bad conduct necessary to be held to be outrageous:

It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Northrup,* 372 N.W.2d at 198; *see also Marks,* 528 N.W.2d at 546 (quoting similar passages from *Vinson,* 360 N.W.2d at 118). Iowa courts have held, as the Restatement suggests, that it is not even sufficient that the conduct in question would have entitled the plaintiff to punitive damages. *Mills,* 454 N.W.2d at 850 (citing *Vinson,* 360 N.W.2d at 118). In *Marks,* the court observed that allegedly outrageous conduct by persons not defendants in the lawsuit in which the outrage claim is asserted is irrelevant. *Marks,* 528 N.W.2d at 546.

It is a simpler matter to discover what kinds of behavior the Iowa Supreme Court has held insufficiently outrageous to sustain the tort than it is to find out what kind of behavior is sufficiently egregious. *See, e.g., Marks,* 528 N.W.2d at 546–47 (allegedly defamatory comments, writings, and statements leading to loss of church membership not sufficiently outrageous to sustain the tort); *Cutler,* 473 N.W.2d at 183 (letter advising partner who had suffered from a period of mental illness that he could not return to law practice without further review by partners was not extremely outrageous and did not generate a genuine issue of material fact on the claim); *Engstrom,* 461 N.W.2d at 320 (negligent failure to search for plaintiffs' adopted daughter's natural father before placing her in plaintiffs' home, and telling adoptive parents the father was dead without verifying his death, were not outrageous); *Kirk v. Farm & City Ins. Co.,* 457 N.W.2d 906, 911 (Iowa 1990) (insurance company's refusal to pay the full amount of uninsured coverage not outrageous); *Mills,* 454 N.W.2d at 849 (rural electric cooperative's conduct in using split bolt connectors instead of compression connectors to connect grounding jumper wire to main neutral line, in failing to discover dangerous situation that such omission presented, and in conducting settlement negotiations through insurance carrier with cooperative customers who sustained fire damage was not sufficiently outrageous); *Tomash v. John Deere Indus. Equip. Co.,* 399 N.W.2d 387, 392–93 (Iowa 1987) (bringing of criminal charges was reasonably appropriate and therefore not outrageous); *Reihmann,* 375 N.W.2d at 681 (claim of improperly exerting influence to transfer employee was too speculative, and transfer of employee after complaints from customers was not outrageous); *Northrup,* 372 N.W.2d at 198–99 (firing for alcoholism not outrageous in light of extensive responsibilities of plaintiff); *Bossuyt v. Osage Farmers Nat'l Bank,* 360 N.W.2d 769, 777 (Iowa 1985) (bank's refusal to pay own cashier's check not outrageous); *Vinson,* 360 N.W.2d at 119 (deliberate campaign to badger and harass employee not outrageous although "petty and wrong, even malicious"); *Harsha v. State Sav. Bank,* 346 N.W.2d 791, 801 (Iowa 1984) (banker's refusal to extend credit causing creditor to default on other obligations not sufficiently outrageous to support jury verdict on emotional distress claim); *Roalson v. Chaney,* 334 N.W.2d 754, 756 (Iowa 1983) (offer to marry made to woman still married and intended for her was not outrageous conduct as to woman's husband, even if it showed poor judgment); *Action Real Estate Corp. v. Bulechek,* 309 N.W.2d 502, 505 (Iowa 1981) (refusal to pay commission on sale of land not outrageous); *Amsden v. Grinnell Mut. Reinsurance Co.,* 203 N.W.2d 252, 255 (Iowa 1972) (refusal to pay fire insurance benefits during period of arson investigation to insured suspected of arson by authorities not outrageous). Few cases can be located where an Iowa court actually held the conduct alleged was sufficiently outrageous. *See, e.g., Blong v. Snyder,* 361 N.W.2d 312, 315–17 (Iowa App.1984) (supervisors' excessive and groundless harassment of employee sufficiently outrageous); *Randa v. U.S. Homes, Inc.,* 325 N.W.2d 905, 907–08 (Iowa App. 1982) (defective construction of home and filing of mechanic's lien so shocking as to support jury verdict for emotional distress).

WCI argues that the only outrageous conduct Reedy has identified is his confrontation by a nurse for Dr. Carlstrom regarding his unpaid bill which Reedy asserts caused him "humiliation." WCI asserts that it is not responsible for the conduct of the nurse, even if her conduct was outra-

geous. The court agrees that no intentional infliction of emotional distress claim based on the allegedly outrageous conduct of persons not defendants can survive summary judgment. *Marks,* 528 N.W.2d at 547.

Although the Iowa Supreme Court has in the past recognized intentional infliction of emotional distress claims against insurers for refusal to pay benefits, *see, e.g., Miller v. Continental Ins. Co.,* 392 N.W.2d 500 (Iowa 1986); *Amsden,* 203 N.W.2d at 253, it follows from the discussion of the bad faith claim, that if WCI did not act in bad faith in refusing to pay workers compensation benefits, because WCI's obligation to pay such benefits was fairly debatable, WCI's conduct in refusing to pay the benefits cannot be outrageous within the meaning of the tort of intentional infliction of emotional distress. To put it another way, if WCI had a "reasonable basis" for denying payment of benefits, it follows that WCI did not act "outrageously" in refusing to pay those benefits. *See Clark–Peterson,* 514 N.W.2d at 916 (having found no bad faith, court also found none of the conduct complained of in the pleadings constituted outrageous conduct). "Objectively reasonable conduct" simply cannot be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *See, e.g., Marks,* 528 N.W.2d at 546.

■ However, Reedy's allegation of intentional infliction of emotional distress in his amended complaint, while incorporating the factual allegations in support of his previous claims, including allegations that WCI outrageously refused to pay medical bills, includes allegations that are not encompassed by the bad faith claim. Those allegations, as clarified in Reedy's resistance to the motion for summary judgment, are that it was outrageous for WCI to insist on Reedy's further medical treatment or further physical examinations while simultaneously gathering information about his past medical condition with the intention of ultimately refusing to pay for the medical treatment it was requiring Reedy to undergo. This allegation therefore stands on a different factual basis from the bad faith claim, and survives or fails independently of the fate of the bad faith claim.

Notwithstanding the reluctance of Iowa courts to find conduct sufficiently outrageous to support a claim of intentional infliction of emotional distress, the court believes that such conduct is presented here. The court believes that recitation of these last facts Reedy has alleged to an average member of the community would arouse his or her resentment against WCI, and lead the community member to exclaim, "Outrageous!" *Northrup,* 372 N.W.2d at 198. A reasonable community member could resent the kind of conniving or mean-spirited conduct that would cause a party apparently responsible for medical bills of an injured person to compel that person to have further treatment while consciously preparing not to pay the bills, thus leaving the person without means to pay for treatment or examinations he would not necessarily have sought if he had known he would have to rely on his own resources. If Reedy can prove that WCI required him to undergo further treatment knowing at the time it required that treatment that it had no intention of paying for it, the court believes that an average member of the community would consider such conduct was worse than "petty and malicious" because it could be perceived to be calculated to inflict financial hardship on Reedy as a means of punishing him in addition to terminating his employment and workers compensation benefits. WCI is therefore not entitled to summary judgment on this narrowly defined claim of intentional infliction of emotional distress on the ground that Reedy has failed to allege conduct that is sufficiently outrageous as a matter of law.

### c. Sufficiency of plaintiff's emotional distress

WCI has not moved for summary judgment on Reedy's claim of intentional infliction of emotional distress on the ground that Reedy cannot show sufficient evidence of emotional distress, and therefore the court need not consider here whether Reedy can make a sufficient showing. However, the court believes that the record as it currently stands leaves grave doubts as to the adequacy of Reedy's allegations of emotional dis-

tress.[15] However, Reedy has not yet been put to the proof or to the necessity of generating at least a genuine issue of material fact on the issue, and therefore this court will not address the adequacy of Reedy's evidence of emotional distress as a ground for summary judgment.

### D. Conclusion

The court concludes that WCI is not entitled to summary judgment on any of Reedy's claims. First, the court concludes that there is a genuine issue of material fact making for a jury question as to which reason, misrepresentations or seeking workers compensation benefits, prompted WCI to discharge Reedy. Thus, WCI is not entitled to summary judgment on Reedy's retaliatory discharge claim.

Next, the court finds that there is a genuine issue of material fact precluding summary judgment on Reedy's bad-faith claim. That issue of fact involves the timing of WCI's resort to advice of counsel as compared to its notification of Reedy that his workers compensation benefits would be terminated. A reasonable factfinder could conclude that WCI failed to exercise an honest and informed judgment in denying Reedy's claim, and therefore could conclude that WCI's assertion that Reedy's entitlement to benefits was not fairly debatable. Thus, a jury question has been generated on Reedy's bad faith claim as to whether or not WCI had an objectively reasonable basis for terminating Reedy's workers compensation benefits at the time the termination decision was made.

Finally, the court concludes that, in addition to an outrage claim based on failure to pay benefits, Reedy has alleged an outrage claim that stands on a different factual basis from the bad faith claim, and survives or fails independently of the fate of the bad faith claim. That claim is based on Reedy's allegation that WCI outrageously insisted on Reedy's further medical treatment or further physical examinations while simultaneously gathering information about his past medical condition with the intention of ultimately refusing to pay for the medical treatment it was requiring Reedy to undergo. The court concludes that such conduct, if proved, would be sufficiently outrageous as a matter of law

---

**15.** The Iowa Supreme Court has established stringent standards for this element of the tort as well. In its most recent decision involving a claim of intentional infliction of emotional distress, the Iowa Supreme Court again rejected the plaintiffs' showing of emotional distress as insufficient to meet the stringent standards for this element of the tort. *Millington,* 532 N.W.2d at 793–94. The court's discussion of the evidence of emotional distress presented in contrast to the level required is instructive:

> The evidence in the record pertaining to plaintiffs' emotional distress was insufficient to generate a fact question as to severe or extreme emotional distress. The record shows that the emotional distress of plaintiff Maryrose consisted of headaches, insomnia, and loss of appetite. She was not treated by a physician or any other medical practitioner for the symptoms and has taken no medications. Also, despite her loss of appetite, she has not suffered any weight loss.
>
> Thomas, Jr.'s emotional distress was similarly insufficient. He initially had some fits of rage but his last such outburst was in November 1989. Like his sister, he suffered no physical difficulties and did not seek any medical attention as a result of the alleged wrongful cremation of his father.
>
> This evidence does not meet the level of proof of severity as existed in the intentional tort actions we have held generated a jury

question. *See, e.g., Meyer [v. Nottger],* 241 N.W.2d [911,] 915–16 [ (Iowa 1976) ] (holding jury question generated where plaintiff was nauseous, had difficulty breathing and suffered acute myocardial ischemia); *Northrup v. Miles Homes, Inc. of Iowa,* 204 N.W.2d 850, 855 (Iowa 1973) (concluding evidence sufficient for jury where plaintiff "broke down," lost forty pounds, and suffered abdominal cramps).

> Rather, the evidence of plaintiffs' distress is similar to that presented in cases where we have held the evidence of mental distress to be insufficient to generate a jury question. *See, e.g., Harsha v. State Sav. Bank,* 346 N.W.2d 791, 801 (Iowa 1984) (holding intentional tort action should not have been submitted to the jury where plaintiff merely "wasn't as interested, or ... was downhearted more or less and depressed"); *Poulsen v. Russell,* 300 N.W.2d 289, 297 (Iowa 1981) (holding plaintiff failed to present substantial evidence of extreme emotional distress to submit claim to a jury where plaintiff "was very, very down, feeling super badly, and felt that he [had] lost everything").

> While the plaintiffs were understandably upset over their father's final disposition, they have not presented sufficient facts on the severe emotional distress element of their intentional tort claim to survive summary judgment disposition.

*Millington,* 532 N.W.2d at 793–94.

to sustain a claim of intentional infliction of emotional distress. Therefore, WCI is not entitled to summary judgment on this claim on the ground it has asserted.

Having denied WCI's motion for summary judgment, the court must also dispose of two other pending motions, WCI's motion to strike two of Reedy's experts, and Reedy's motion for ruling on evidence in advance of trial.

### III. THE MOTION TO STRIKE EXPERTS

In addition to moving for summary judgment, on May 22, 1995, WCI also moved to strike two of Reedy's designated expert witnesses as insufficiently qualified to give expert opinions on the issues in this case. WCI asserts that Reedy's experts lack sufficient formal training or adequate experience related to the issues on which they are likely to testify to offer expert opinions. Reedy counters that the two witnesses in question are sufficiently qualified in the narrow area about which their expertise is sought, claims handling procedures, to give expert opinions. The court turns first to the qualifications of the expert witnesses in question.

#### A. The Proffered Experts

WCI has moved to strike two individuals Reedy has designated as expert witnesses in this matter, John J. Puk and Leonard O. Weaver III. Reedy designated both as experts who will testify on "claims procedures, etc.," on November 14, 1991. Presumably because of the stay in this matter, WCI did not depose these two experts until March 21, 1995.

John J. Puk is now 29 years old. He graduated from the University of Iowa in May of 1988 with a bachelor's degree in business administration and finance. Puk's first employment after graduating from the university was as a full-time life insurance salesman for Prudential Life. Puk pursued that employment from approximately July until December of 1988 before going to work as a carpenter for approximately the next four months. From March of 1989 until March of 1990, Puk worked as a claims adjuster for Liberty Mutual Insurance in Des Moines, Iowa. Puk received eight weeks of training for this position from Liberty Mutual Insurance. After working as a claims adjuster in Des Moines for approximately one year, Puk was transferred to Kansas City, Missouri, where he continued to work as a claims adjuster until he entered law school in August of 1990. After law school, Puk obtained his license to practice law in Iowa, Nebraska, Kansas, and Missouri, and has pursued primarily a litigation practice. He has not returned to work as a claims adjuster, and neither insurance nor workers compensation law occupies a major part of his law practice.

Leonard O. Weaver III is currently 35 years old. Weaver graduated from William Penn College in 1982 with a bachelor's degree in business administration. He was a retail sales manager for Goodyear Tire from 1982 to 1983, then a sales administrator for American Reading Academy from 1983 through 1985. Weaver became a claims adjuster for Liberty Mutual Insurance Company on April 21, 1986. He received six weeks of training for this position. In 1987 Weaver was promoted to the position of senior claims adjuster with increased authority to settle claims. Weaver testified in depositions that approximately 60% of his time as a claims adjuster was spent on workers compensation claims. Weaver left his employment with Liberty Mutual Insurance in May of 1989 to become the safety director for Crouse Cartage, a company with approximately 840 employees. In this position, Weaver is primarily responsible for administering workers compensation claims filed by employees, hiring truck drivers, and complying with federal regulations of the Department of Transportation and regulations concerning hazardous materials. Weaver has continued to receive training at various seminars and workshops, some of which pertained to workers compensation claims.

Neither of Reedy's proffered experts has published any articles of any kind, and neither receives professional literature concerning workers compensation law or claims handling.

### B. Legal Analysis

#### 1. Standards for expert witnesses

The Federal Rules of Evidence provide for testimony of experts as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. The decisions of the Eighth Circuit Court of Appeals and the United States Supreme Court have significantly amplified and clarified the meaning of this rule.

■ The Eighth Circuit Court of Appeals has said that " 'Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony.' " Sylla–Sawdon v. Uniroyal Goodrich Tire Co., 47 F.3d 277, 283 (8th Cir.1995) (quoting Fox v. Dannenberg, 906 F.2d 1253, 1256 (8th Cir.1990)). The court observed further that

> we acknowledged in Fox that "an individual can qualify as an expert where he possesses sufficient knowledge gained from practical experience, even though he may lack academic qualifications in the particular field of expertise." [Fox, 906 F.2d at 1256.] We also observed in Fox that "[t]he threshold question of whether a witness is competent as an expert is solely for the trial judge, and, as the text of Rule 702 suggests, the central issue is whether the expert's testimony will assist the trier of fact." Id. Once the trial court has determined "that a witness is competent to testify as an expert, challenges to the expert's skill or knowledge go to the weight to be accorded the expert testimony rather than to its admissibility." Id.; Williams v. Pro–Tec, Inc., 908 F.2d 345, 348 (8th Cir. 1990); Davis v. American Jet Leasing, Inc., 864 F.2d 612, 614–15 (8th Cir.1988);

Nielson v. Armstrong Rubber Co., 570 F.2d 272, 276–77 (8th Cir.1978). Sylla–Sawdon, 47 F.3d at 283.[16]

The Supreme Court has held that expert testimony must be both competent and such that it will assist the trier of fact in determining a fact in issue. Daubert v. Merrell Dow Pharmaceuticals, Inc., — U.S. —, —, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993); see also Pioneer Hi–Bred Int'l v. Holden Found. Seeds, Inc., 35 F.3d 1226, 1230 (8th Cir.1994) (same). In Daubert, these two considerations were described as a "reliability" prong and a "relevancy" prong to the test of admissibility of an expert's testimony. Daubert, — U.S. at — – —, —, 113 S.Ct. at 2795–96, 2799 ("[A]n expert's testimony [must] both rest [ ] on a reliable foundation and [be] relevant to the task at hand."); see also Sorensen By and Through Dunbar v. Shaklee Corp., 31 F.3d 638, 647–48 (8th Cir. 1994). However, courts have treated both relevance and reliability as going to the ultimate issue under Rule 702, which is whether the testimony will be "helpful" to or "will assist" the jury. Fed.R.Evid. 702; Daubert, — U.S. at —, 113 S.Ct. at 2799; United States v. Johnson, 28 F.3d 1487, 1496 (8th Cir.1994) (citing Daubert ).

■ Thus, courts have considered whether an expert's specialized knowledge will help the jury understand evidence or decide a fact issue. TCBY Systems, Inc. v. RSP Co., Inc., 33 F.3d 925, 929 (8th Cir. 1994); United States v. Hughes, 15 F.3d 798, 800 (8th Cir.1994); United States v. Nunn, 940 F.2d 1148, 1149 (8th Cir.1991). Therefore, expert testimony may be excluded if the jury is equally able to draw the asserted conclusion. Watkins v. Schriver, 52 F.3d 769, 772 (8th Cir.1995); United States v. French, 12 F.3d 114, 116 (8th Cir.1993) ("Expert testimony is appropriate when it relates to issues that are beyond the ken of people of ordinary intelligence," but " [w]here the subject matter is within the knowledge or experience of laymen, expert testimony is super-

---

16. Under Fed.R.Evid. 704(a), an expert may give an opinion on an ultimate issue for the jury. TCBY Systems, Inc. v. RSP Co., Inc., 33 F.3d·925, 929 (8th Cir.1994). However, "[o]pinions that are 'phrased in terms of inadequately explored legal criteria' or that 'merely tell the jury what

result to reach' are not deemed helpful to the jury, Fed.R.Evid. 704 advisory committee's note, and thus are not admissible under Rule 702." United States v. Whitted, 11 F.3d 782, 785 (8th Cir.1993).

fluous,' " quoting *Bartak v. Bell–Galyardt & Wells, Inc.,* 629 F.2d 523, 530 (8th Cir.1980)); *Williams v. Pro–Tec, Inc.,* 908 F.2d 345, 348–49 (8th Cir.1990). Expert testimony may also be excluded if it would not relate to any issue in the case, because it is " 'not relevant and, ergo, nonhelpful.' " *Sorensen By and Through Dunbar v. Shaklee Corp.,* 31 F.3d 638, 647–48 (8th Cir.1994) (quoting *Daubert,* —— U.S. at ——, 113 S.Ct. at 2795, in turn quoting 3 Weinstein & Berger ¶ 702[02], p. 702–18).

Courts have also considered whether the proffered expert is properly qualified to give an opinion in the matter, such that the expert's opinion will be of assistance to the jury in deciding the matter. *Sylla–Sawdon,* 47 F.3d at 283 (concluding proffered expert was not competent to qualify as an expert in tire failure, because nothing about his experience suggested his opinion would assist the jury on that issue). WCI challenges Reedy's experts primarily on the ground of competence to offer expert opinions.

█ Pursuant to the Supreme Court's decision in *Daubert,* —— U.S. at ——, 113 S.Ct. at 2796, in determining the competence of an expert witness, the trial court must first determine under *Fed.R.Evid.* 104(a) whether the expert's testimony rests on a reliable foundation. *McKnight v. Johnson Controls, Inc.,* 36 F.3d 1396, 1406 (8th Cir.1994). The Eighth Circuit Court of Appeals observed that " 'if an expert opinion is so fundamentally unsupported that it can offer no assistance to the jury, then the testimony should not be admitted.' " *Hughes,* 15 F.3d at 800 (quoting *Loudermill v. Dow Chemical Co.,* 863 F.2d 566, 570 (8th Cir.1988)).

█ In *United States v. Cotton,* 22 F.3d 182 (8th Cir.1994), the court considered a challenge to expert testimony similar to the one made here by WCI. The defendant challenged the qualifications of a detective to offer expert testimony on the ground that he was not a formally trained drug expert. *Cotton,* 22 F.3d at 185. The court, however, held that "an individual can qualify as an expert by possessing knowledge gained from practical experience." *Id.* (citing *Fox,* 906 F.2d at 1256); *accord Johnson,* 28 F.3d at 1496 (six years experience in drug trafficking

qualified witness as expert); *Hughes,* 15 F.3d at 801 (witness's 32 years of experience in the field with duties including activities about which witness was testifying were sufficient to qualify witness as expert). The court found further that the detective had specialized knowledge about activities with which most jurors were not familiar, such as the modus operandi of drug dealers, and therefore his opinion was helpful to the jury in understanding the evidence and determining the facts in issue, even if it addressed the ultimate issue to be decided by the trier of fact. *Id.* The court therefore upheld the admission of the expert testimony over the defendant's objections. *Id.* The Eighth Circuit Court of Appeals has long been "mindful of Rule 702 and [its] own case law's recognition of practical knowledge and experience as providing an adequate basis for expert testimony." *Garnac Grain Co., Inc. v. Blackley,* 932 F.2d 1563, 1567 (8th Cir.1991). However, where the witness's practical knowledge does not provide the requisite expertise in the area on which they are asked to offer an expert opinion, the witness's testimony my be excluded. *Id.* at 1566–67.

█ Finally, Rule 702 "is one of admissibility rather than exclusion." *Arcoren v. United States,* 929 F.2d 1235, 1239 (8th Cir.1991); *Fox,* 906 F.2d at 1256; *Hurst v. United States,* 882 F.2d 306, 311 (8th Cir. 1989). A district court's ruling on the admissibility or exclusion of expert testimony will be reversed only for abuse of discretion. *Watkins,* 52 F.3d at 771; *TCBY Systems, Inc.,* 33 F.3d at 929; *Hughes,* 15 F.3d at 800; *Gilliam v. Roche Biomedical Labs., Inc.,* 989 F.2d 278, 279 (8th Cir.1993); *Nunn,* 940 F.2d at 1149; *United States v. Cortez,* 935 F.2d 135, 138 (8th Cir.1991).

### 2. *Admissibility of the proffered experts' opinions*

█ As an initial matter, the court concludes that claims adjusting procedure is also something about which the average juror is unlikely to have sufficient knowledge or experience to form an opinion without expert guidance, thus expert testimony would not be superfluous. *Watkins,* 52 F.3d at 772;

*French,* 12 F.3d at 116; *Bartak,* 629 F.2d at 530; *Pro–Tec, Inc.,* 908 F.2d at 348–49. Furthermore, such testimony does indeed relate to issues in the case. *Shaklee Corp.,* 31 F.3d at 647–48.

■ Turning to the particular experts Reedy has designated, the court finds that Weaver has sufficient practical experience in claims adjusting generally, and in processing workers compensation claims specifically, to qualify as an expert on the narrow issue for which Reedy offers his opinion, claims procedures. *Sylla–Sawdon,* 47 F.3d at 283; *Cotton,* 22 F.3d at 185; *Hughes,* 15 F.3d at 801; *Garnac Grain Co., Inc.,* 932 F.2d at 1567. Weaver's experience is sufficient that his opinions would be of assistance to a jury in considering whether WCI's claims processing procedure was usual or appropriate. *Fed. R.Evid.* 702; *Daubert,* — U.S. at —, 113 S.Ct. at 2796; *Sylla–Sawdon,* 47 F.3d at 283; *Pioneer Hi–Bred Int'l,* 35 F.3d at 1230. Furthermore, Weaver's experience is sufficient to provide a reliable foundation for his opinions. *McKnight,* 36 F.3d at 1406. It is not " 'so fundamentally unsupported that it can offer no assistance to the jury.' " *Hughes,* 15 F.3d at 800 (quoting *Loudermill v. Dow Chemical Co.,* 863 F.2d 566, 570 (8th Cir.1988)).

■ Puk's qualifications, however, present a much closer question. Puk's claims adjusting experience is fairly limited, and bore relatively little relationship to the specific kind of claim, and ground for rejecting it, at issue here. However, Puk does have some experience working in a field unfamiliar to most jurors. *Watkins,* 52 F.3d at 772; *French,* 12 F.3d at 116; *Bartak,* 629 F.2d at 530; *Pro–Tec, Inc.,* 908 F.2d at 348–49. Because it is mindful of the fact that Rule 702 "is one of admissibility rather than exclusion," *Arcoren,* 929 F.2d at 1239; *Fox,* 906 F.2d at 1256; *Hurst,* 882 F.2d at 311, the court finds Puk qualified as an expert, but again, only on the very narrow issue for which Reedy now asserts his expert testimo-

ny will be offered, claims adjusting procedures.

### C. *Conclusion*

■ The court concludes that these proffered experts are competent to testify, and WCI's motion to strike them must be denied. However, WCI is, of course, entitled to pursue further challenges to these experts' skill or knowledge in order to attack the weight to be accorded their expert testimony. *Sylla–Sawdon,* 47 F.3d at 283; *Pro–Tec, Inc.,* 908 F.2d at 348; *Fox,* 906 F.2d at 1256; *Davis,* 864 F.2d at 614–15; *Nielson,* 570 F.2d at 276–77.

### IV. THE MOTION FOR RULING IN ADVANCE OF TRIAL

The final matter before the court at this time is Reedy's motion for ruling in advance of trial on the admissibility of the findings of the Deputy Industrial Commissioner, the Industrial Commissioner, and the Polk County District Court arising from Reedy's challenge to termination of his workers compensation benefits.[17] Reedy argues that the administrative findings are not supported by sufficient or substantial evidence to be admissible pursuant to *Fed.R.Evid.* 803(8)(C). Reedy argues further that if the court determines that the administrative findings are admissible pursuant to *Fed.R.Evid.* 803(8)(C), the court should nonetheless exclude such findings pursuant to *Fed.R.Evid.* 403 on the ground that any probative value they may have is outweighed by their unfair prejudice to Reedy. Reedy's arguments, at bottom, are that the jury in this case should be allowed to make its own determinations from the evidence before them.

WCI argues that administrative findings are routinely held admissible in this circuit, and that a number of circuit courts of appeals in fact have *per se* admissibility rules for such findings, or accept that they are highly probative evidence that should not be excluded without some specific indication of a lack of trustworthiness. WCI argues that the

---

17. Reedy stated that it was not his intention at this time to make a formal motion *in limine,* but instead to seek a less formal ruling in advance of trial. The court, however, finds no authority, and Reedy has offered none, for such a ruling except under the authority of *Fed.R.Evid.* 104. The court has therefore disposed of the motion pursuant to that rule.

Industrial Commission findings in this case are significantly more reliable than EEOC findings excluded upon occasion by the Eighth Circuit Court of Appeals. WCI also asserts that because the issues before the administrative body were slightly different from those before this court, the likelihood of unfair prejudice is remote. The court therefore turns to resolution of this dispute over the admissibility of the administrative findings in this action.

### A. Background

Reedy sought a proceeding in arbitration before the Iowa Industrial Commission concerning the termination of his workers compensation benefits. A deputy industrial commissioner held an evidentiary hearing on February 16, 1992, and rendered a decision on April 17, 1992. Both parties appealed the decision of the deputy industrial commissioner to the industrial commissioner. The commissioner rendered an appeal decision on August 12, 1993, adopting the majority of the findings of fact of the deputy industrial commissioner and affirming his decision. Reedy then sought judicial review in the Iowa District Court for Polk County. WCI cross-appealed. The district court rendered its decision on judicial review on August 31, 1994, affirming the decision of the Iowa industrial commissioner. In each of the proceedings Reedy has identified, the findings of the court or hearing officer were, *inter alia*, that Reedy had intentionally misrepresented his health condition on his application and health forms. However, at each level of review, the hearing officer or court held that intentional misrepresentation by the claimant was not a defense to payment of workers compensation benefits in Iowa.

### B. Legal Analysis

#### 1. Admissibility of administrative findings generally

▉▉▉▉▉ Federal Rule of Evidence 803 provides, in pertinent part, as follows:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

 \* \* \* \* \* \*

(8) Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies ... (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

*Fed.R.Evid.* 803(8)(C). Again, a district court's exclusion or admission of evidence is reviewed for abuse of discretion. *Doss v. Frontenac*, 14 F.3d 1313, 1318 (8th Cir.1994) (citing *Warner v. Transamerica Ins.*, 739 F.2d 1347, 1350 (8th Cir.1984)); *May v. Arkansas Forestry Comm'n*, 993 F.2d 632, 637 (8th Cir.1993). More specifically, "[i]n an employment discrimination case, the decision whether to admit or exclude administrative findings, such as EEOC investigation matters, is properly left to the sound discretion of the trial court. *Id.* (citing *Johnson v. Yellow Freight System, Inc.*, 734 F.2d 1304 (8th Cir.), *cert. denied*, 469 U.S. 1041, 105 S.Ct. 525, 83 L.Ed.2d 413 (1984)); *see also O'Dell v. Hercules, Inc.*, 904 F.2d 1194, 1200 (8th Cir.1990) (admissibility of evidence is reviewed for abuse of discretion, and will be held to be so prejudicial as to require a new trial only where there has been a clear abuse of discretion). Even if evidence would be admissible under *Fed.R.Evid.* 803(8)(C), it may nonetheless be excluded as overly prejudicial or irrelevant pursuant to *Fed.R.Evid.* 403 and 402. *May*, 993 F.2d at 636–37.

As *Fed.R.Evid.* 803(8)(C) states, public records and agency findings are not admissible if circumstances indicate a lack of trustworthiness. *Fed.R.Evid.* 803(8)(C); *Donald v. Rast*, 927 F.2d 379, 381 (8th Cir.1991); *O'Dell*, 904 F.2d at 1204. In *Donald*, the trial court properly excluded findings of an administrative law judge rescinding the plaintiff's drivers license, because the court found the findings resulted from an *ex parte* administrative proceeding, and therefore lacked trustworthiness. *Donald*, 927 F.2d at 381. The appellate court also observed, "We agree with the district court that because the jury might have given undue consideration to the *ex parte* administrative findings, unfair

prejudice could have resulted to the officers." *Id.*

Similarly, in *O'Dell,* the court

"reiterate[d] that the trustworthiness inquiry is the primary limitation and safeguard against the admission of unreliable evidence in public reports. This court has previously held that once a report is conclusively shown to be governed by Rule 803(8)(C) because it is comprised of findings of a public agency made pursuant to an investigation authorized by law, the essential inquiry becomes whether the report is trustworthy. *Kehm v. Procter & Gamble Mfg.,* 724 F.2d 613, 618 (8th Cir.1983).

*O'Dell,* 904 F.2d at 1204. However, the court did not identify the nature of the trustworthiness inquiry courts are to pursue, finding that the inquiry "is committed to the sound discretion of the trial court." *Id.* However, the court approved exclusion of some evidence in public reports that pertained to operations at a plant after the defendant in that action ceased to own or operate the plant, and therefore the report was properly excluded on grounds of relevance, under Rule 401, and prejudice, under Rule 403. *Id.* at 1204–05. The court also approved admission of other reports for which no showing of a lack of trustworthiness had been made. *Id.* at 1205. As to the latter reports, the court noted that there would be no prejudice from admitting those reports where the party challenging their admission would have the opportunity to challenge the methodology and findings at trial. *Id.* (citing *Kehm,* 724 F.2d at 618).

In contrast to these decisions, in both *Estes v. Dick Smith Ford, Inc.,* 856 F.2d 1097, 1105 (8th Cir.1988), and *Johnson v. Yellow Freight System,* 734 F.2d 1304, 1308–10 (8th Cir.), *cert. denied,* 469 U.S. 1041, 105 S.Ct. 525, 83 L.Ed.2d 413 (1984), the Eighth Circuit Court of Appeals held that administrative decisions of the EEOC should not be admitted. In *Estes* the court explained its decisions as follows:

The court must exercise its discretion ... to ensure that unfair prejudice does not result from a conclusion based on a cursory EEOC review of the very facts examined in depth at trial. In this case, the EEOC determination exhibits the same danger signs we held justified exclusion in *Yellow Freight.* Here, Estes's adverse EEOC determination letter consisted only of two conclusory sentences, precisely like the letter excluded in *Yellow Freight.* As we said in that case,

... there is little probative value in the EEOC's conclusory statements regarding the same evidence [presented to the jury]. To admit the report under these circumstances would amount to admitting the opinion of an expert witness as to what conclusions the jury should draw, even though the jury had the opportunity and the ability to draw its own conclusions from the evidence....

*Id.* at 1309. More importantly, the EEOC based its determination of no reasonably cause on Ford's earlier explanation that Estes had been laid off due to a reduction in force. Any evidentiary value the EEOC letter might have had is severely undermined where the EEOC made findings based on accounts of a termination different from the ones presented at trial.

*Estes,* 856 F.2d at 1105–06.[18] In *United States v. York,* 830 F.2d 885 (8th Cir.1987), the court upheld the district court's exclusion of FBI administrative reports, not because they were conclusory and therefore not trustworthy, but because the party seeking admission of the reports was given liberal opportunities to develop the evidence found in the reports in other ways at trial, and the reports would have been merely duplicative. *York,* 830 F.2d at 889.

### 2. Admissibility of the Industrial Commission reports

In order to assess the trustworthiness of the administrative reports at issue here, the court turns first to the statutory provisions

---

**18.** In *Strong v. Mercantile Trust Co., N.A.,* 816 F.2d 429 (8th Cir.1987), the district court, citing *Johnson,* 734 F.2d at 1309, excluded another EEOC determination. *Strong,* 816 F.2d at 431. The appellate court found that the district court's

exclusion of the determination did not automatically exclude other matters relating to the EEOC factfinding hearing, such as a discussion between the plaintiff and the defendant. *Id.*

creating the Iowa Industrial Commission and establishing its duties and procedures. The Iowa Industrial Commissioner is appointed by the governor pursuant to the provisions of Iowa Code § 86.1. The duties of the commissioner include "adopting and enforcing rules necessary to implement" the Iowa workers compensation, occupational disease compensation, occupational hearing loss, compensation liability insurance, and industrial services acts. Iowa Code § 86.8. Most importantly here, the commissioner or a deputy commissioner may preside over any contested case proceeding brought under the industrial services, workers compensation, or occupational disease compensation acts. Iowa Code § 86.17(1). In such proceedings, "all matters relevant to a dispute are subject to inquiry," Iowa Code § 86.14(1), and "the deputy commissioner or commissioner may make such inquiries and investigation in contested case proceedings as shall be deemed necessary," consistent with the Iowa administrative procedure act. Iowa Code § 86.17(1). At hearings on contested cases, "[e]vidence, process and procedure ... shall be as summary as practicable," consistent with the administrative procedure act, Iowa Code § 86.18(1), but a contested case under the administrative procedure act "means a proceeding ... in which the legal rights, duties or privileges of a party are required by Constitution or statute to be determined by an agency after opportunity for an evidentiary hearing." Iowa Code § 17A.2(6). The proceedings are reported by a certified shorthand reporter, and decisions of the deputy commissioner are appealable in the first instance to the industrial commissioner, Iowa Code § 86.24(1), and thereafter judicial review is available in the district courts of the state of Iowa. Iowa Code § 86.26.

The decisions in this case followed evidentiary hearing on February 26, 1992. The parties presented evidence in the form of oral testimony and written exhibits, and the deputy industrial commissioner made extensive findings of fact and conclusions of law. Thus, the decisions in question here bear no resemblance whatsoever to the cursory and conclusory reports excluded by the Eighth Circuit Court of Appeals in *Estes* and *Johnson.* There are simply no indications here of a lack of trustworthiness in either the proceedings or the resulting decisions. *Fed. R.Evid.* 803(8)(C); *Donald v. Rast,* 927 F.2d 379, 381 (8th Cir.1991); *O'Dell,* 904 F.2d at 1204; *Estes,* 856 F.2d at 1105; *Johnson,* 734 F.2d at 1308–10. Nor does the contested nature of the proceedings suggest the kind of prejudice that might arise from *ex parte* proceedings. *Donald,* 927 F.2d at 381. Nor would any prejudice from admitting those reports result here when Reedy will have the opportunity to challenge the methodology and findings in those decisions at trial. *O'Dell,* 904 F.2d at 1204; *Kehm,* 724 F.2d at 618. Finally, although the decisions pertain to relevant matters, and are highly probative on those matters in light of the development of the record before the Industrial Commission, the issues being litigated here are sufficiently different from those addressed by the reports, which pertain only to termination or continuation of Reedy's workers compensation benefits, that the reports do not amount to admitting the opinion of an expert witness as to what conclusions the jury should draw in this case. *Estes,* 856 F.2d at 1105–06; *Johnson,* 734 F.2d at 1309.

### C. Conclusion

The court finds the administrative decisions from the Iowa Industrial Commission and the decision upon judicial review of those administrative decisions to be sufficiently trustworthy and non-prejudicial to be admissible at trial of this matter. Reedy's motion for ruling in advance of trial is therefore granted to the extent that such a ruling has been made, and pursuant to that ruling the administrative decisions and judicial review decision will be admissible at trial in this matter.

### V. CONCLUSIONS

The court concludes that WCI is not entitled to summary judgment on any of Reedy's claims. The court concludes that there are genuine issues of material fact making for a jury question on each claim. These genuine issues of material fact involve the reason for Reedy's discharge by WCI, the timing of WCI's resort to advice of counsel as com-

pared to its notification of Reedy that his workers compensation benefits would be terminated, and whether WCI insisted on Reedy's further medical treatment or further physical examinations while simultaneously gathering information about his past medical condition with the intention of ultimately refusing to pay for the medical treatment it was requiring Reedy to undergo, conduct which, if proved, this court concludes would be sufficiently outrageous as a matter of law to sustain a claim of intentional infliction of emotional distress. WCI's motion for summary judgment must therefore be denied.

WCI's motion to strike two or Reedy's experts must also be denied. The court finds that both witnesses are sufficiently qualified as experts to address the narrow issue of claims adjusting procedures, although the qualifications of Mr. Puk present a very close question. The court concludes further the narrow issue for which Reedy offers these experts is such that expert testimony would be helpful to the jury. The court concludes that the motion to strike experts must be denied. However, WCI is, of course, entitled to pursue further challenges to these experts' skill or knowledge in order to attack the weight to be accorded their expert testimony.

Finally, the court grants Reedy's motion for ruling in advance of trial on the admissibility of evidence to the extent that it has examined the evidence in question, administrative decisions from proceedings before the Iowa Industrial Commission and a decision upon judicial review of those proceedings, and finds that the evidence is admissible under *Fed.R.Evid.* 803(8)(C). The decisions are trustworthy, in light of the nature of the proceedings and thoroughness of the findings and conclusions offered, probative of matters involved in this litigation, and no prejudice to Reedy will result from their admission.

**IT IS SO ORDERED.**